# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| JOHN A. MANSOUR, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| MORGAN STANLEY; MORGAN | § | |
| STANLEY & CO. LLC; MORGAN | § | Civil Action No. 4:24-cv-459 |
| STANLEY SMITH BARNEY LLC; | § | Judge Mazzant |
| MERRILL LYNCH, PIERCE, FENNER & | § | |
| SMITH INCORPORATED; DEUTSCHE | § | |
| BANK SECURITIES INC.; CHARLES | § | |
| SCHWAB & CO., INC., | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are the following Motions, and the Court, having considered the

Motions, the relevant pleadings, and the applicable law, finds as follows:

1. Plaintiff's Motion for Leave to Amend the Complaint (Dkt. #143) should be **DENIED**.

2. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Motion to Compel Arbitration (Dkt. #32) should be **GRANTED**.

3. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Motion to Dismiss (Dkt. #44) should be **DENIED as moot.**

4. Defendant Deutsche Bank Securities Inc.'s Motion to Compel Arbitration (Dkt. #46) should be **GRANTED**.

5. Defendant Charles Schwab & Co., Inc.'s Motion to Compel Arbitration (Dkt. #47) should be **GRANTED**.

6. Defendant Morgan Stanley's Motion to Sever and Transfer (Dkt. #48) should be **GRANTED**.

7. Defendant Morgan Stanley's Motion to Strike portions of Plaintiff's Sur-Reply (Dkt. #141) should be **GRANTED**. Section I of Plaintiff's Sur-Reply should be **STRUCK** (Dkt. #138 at pp. 4–7). Morgan Stanley's Motion for Leave to file a Sur-Sur-Reply should be **DENIED as moot.**

8. All litigation in the present lawsuit should be **STAYED** pending arbitration.

9. All other relief requested in these Motions not previously granted should be **DENIED** without prejudice.

## BACKGROUND

### I.    Factual Background

This case is about a long-running, industry-wide financial scandal perpetrated by four of the largest financial institutions against a single man. Plaintiff, John Mansour, alleges that the lawsuit arises from a "coordinated, multi-year scheme" to exploit millions of dollars from him through money laundering, conversion, and theft (Dkt. #1 at ¶ 1). Supposedly, the scheme began in 1998, shortly after Plaintiff sold his business (Dkt. #1 at ¶ 2). At the advice of his brother, Plaintiff hired a trusts and estates attorney and placed the cash and stock proceeds from the sale at Morgan Stanley (Dkt. #1 at ¶ 3). Over the next twenty years, he moved his funds from one financial institution to another (Dkt. #1). Allegedly, all four banks engaged in coordinated, planned, covert, and illicit transactions to use Plaintiff's money for money laundering and theft (*See* Dkt. #1).

In 2021, Plaintiff, aghast at the continual losses he had suffered, engaged experts to investigate his financial accounts (Dkt. #1 at ¶ 5). This investigation expanded from 2022 through 2024 to include forensic accountants, attorneys, and an investment banking expert, which ultimately revealed "hard evidence of a scheme so farfetched no reasonable investor would ever have believed it." (Dkt. #1 at ¶ 5). Over his twenty years of investing, Plaintiff discovered that his brothers, their attorney, and the four banks had used his assets for unauthorized transactions involving over a billion dollars (Dkt. #1 at ¶ 5). In response to that discovery, Plaintiff filed this lawsuit on May 17, 2024 (Dkt. #1). Through it, Plaintiff named the following entities as Defendants: (1)(a) Morgan Stanley, (1)(b) Morgan Stanley & Co. LLC, and (1)(c) Morgan Stanley

Smith Barney LLC (collectively "Morgan Stanley"); (2) Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"); (3) Deutsche Bank Securities Inc. ("Deutsche Bank"); (4) Charles Schwab & Co., Inc. ("Charles Schwab"); and (5) twenty John Doe defendants (Dkt. #1 at ¶¶ 9–13).[1] He alleges Defendants are liable to him for fraud, breach of fiduciary duty, conversion, unjust enrichment, and for violations of the Civil Racketeer Influenced and Corrupt Organizations Act ("RICO") (Dkt. #1 at ¶¶ 458–656).

## II.    Procedural Background

The current procedural battle began on July 16, 2024, when Merrill Lynch filed its Motion to Compel Arbitration and to Stay Pending Arbitration (Dkt. #32). Plaintiff filed his Response on August 6, 2024 (Dkt. #36). Merrill Lynch filed its Reply on September 4, 2024, and Plaintiff filed a Sur-Reply on September 25, 2024 (Dkt. #66; Dkt. #74). Additionally, while Plaintiff and Merrill Lynch were litigating the propriety of arbitration, Merrill Lynch filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) (Dkt. #44). Plaintiff Responded to the Motion to Dismiss on October 28, 2024 (Dkt. #97). Merrill Lynch filed its Reply on December 16, 2024 (Dkt. #121). Plaintiff did not file a Sur-Reply.

Following Merrill Lynch's lead, Deutsche Bank, Charles Schwab, and Morgan Stanley all filed Motions to Compel Arbitration on August 12, 2024 (Dkt. #46; Dkt. #47; Dkt. #48). Deutsche Bank's Motion seeks to compel arbitration and stay the proceedings, or in the alternative to sever and transfer venue, or in the alternative to dismiss the action (Dkt. #46). Charles Schwab seeks to compel arbitration or in the alternative to dismiss the action (Dkt. #47). Morgan Stanley's Motion

---

[1] For the purposes of this Order, the Court will use the term "Defendants" to refer collectively to Morgan Stanley, Merrill Lynch, Deutsche Bank, and Charles Schwab.

is not a traditional Motion to Compel Arbitration because its contracts with Plaintiff allow him the right to elect arbitration or litigation (*See* Dkt. #48). Thus, Morgan Stanley seeks to have Plaintiff make that election (Dkt. #48). If Plaintiff elects arbitration, Morgan Stanley asks the Court to compel arbitration (Dkt. #48). However, if Plaintiff elects litigation, or if the Court deems he elected litigation, Morgan Stanley seeks to have the claims against it severed and transferred to the Southern District of New York, or in the alternative, to dismiss the claims against it (Dkt. #48).

Plaintiff filed Responses to Morgan Stanley, Deutsche Bank, and Charles Schwab on October 28, 2024 (Dkt. #94; Dkt. #96; Dkt. #99). The next day, Plaintiff filed a Corrected Response to Charles Schwab's Motion, which was substantively the same as his first Response but included a Table of Authorities (Dkt. #100). Charles Schwab filed its Reply to Plaintiff's Response on November 14, 2024 (Dkt. #109). Deutsche Bank and Morgan Stanley filed their Replies on December 16, 2024 (Dkt. #125; Dkt. #126). Plaintiff filed his Sur-Replies to Morgan Stanley, Deutsche Bank, and Charles Schwab on January 10, 2025 (Dkt. #137; Dkt. #138; Dkt. #139). In response to Plaintiff's Sur-Reply, Morgan Stanley filed a Motion to Strike portions of Plaintiff's Sur-Reply that raised new arguments in violation of the Court's Local Rules, or in the alternative, for leave to file a Sur-Sur-Reply, on January 17, 2025 (Dkt. #141; Dkt. #142). Plaintiff filed a Response to the Motion to Strike on February 3, 2025 (Dkt. #151). Morgan Stanley filed a Reply to Plaintiff's Response on February 10, 2025 (Dkt. #156).

In the midst of these filings, Plaintiff filed a Notice of Supplemental Authority, relying on the Fifth Circuit's decision in *Alliance for Fair Board Recruitment v. Securities and Exchange Commission* (Dkt. #123) (citing 125 F.4th 159 (5th Cir. 2024)). He claims that *Alliance* is dispositive of the arbitration issues and the Court should deny all of the Motions to Compel Arbitration

4

(Dkt. #123). Charles Schwab filed a Response to Plaintiff's Notice of Supplemental Authority on December 18, 2024 (Dkt. #131). The following day, Merrill Lynch filed its Response (Dkt. #132). Deutsche Bank addressed the applicability of *Alliance* in its Reply to Plaintiff's Response to its Motion to Compel Arbitration (*See* Dkt. #109). Morgan Stanley did not respond to the Notice of Supplemental Authority.

To add to the procedural intrigue, Charles Schwab filed a Motion to Stay Discovery until the Court resolved the Motions to Compel Arbitration on September 17, 2024 (Dkt. #70). The other Defendants joined this Motion (Dkt. #71; Dkt. #72; Dkt. #73). The Court held a hearing on the Motion to Stay on January 31, 2025 (Dkt. #147). However, on January 27, 2025, Plaintiff filed a Motion for Leave to Amend his Complaint (Dkt. #143; Dkt. #144). In doing so, Plaintiff sought to moot the arbitration motions by turning his lawsuit into a nationwide class action that would challenge arbitration in front of the Financial Industry Regulatory Authority ("FINRA") (Dkt. #144). After the hearing, the Court granted Charles Schwab's Motion to Stay and stayed discovery on January 31, 2025, until it resolved the Motions to Compel Arbitration (Dkt. #149). On February 24, 2025, Defendants filed their Responses in Opposition of Plaintiff's Motion for Leave to Amend his Complaint (Dkt. #161; Dkt. #162; Dkt. #163; Dkt. #164). Plaintiff filed a Reply to all of the Defendants' Responses on March 10, 2025 (Dkt. #167). Defendants filed their Sur-Replies on March 17, 2025 (Dkt. #169; Dkt. #170; Dkt. #171; Dkt. #172).

## LEGAL STANDARD

### I.    Leave to Amend

"When a trial court imposes a scheduling order, Federal Rules of Civil Procedure 15 and 16 operate together to govern the amendment of pleadings." *Tex. Indigenous Council v. Simpkins*, 544 F. App'x 418, 420 (5th Cir. 2013). Rule 15(a) governs a party's request to amend its pleading

before a scheduling order's deadline to amend passes. *See id.* Rule 16(b)(4) governs a party's request to amend its pleading after the deadline to amend passes. S*app v. Mem'l Hermann Healthcare Sys.*, 406 F. App'x 866, 868 (5th Cir. 2010) (citing *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003)).

Rule 15(a) provides that a party may amend its pleading once without seeking leave of court or the consent of the adverse party at any time before a responsive pleading is served. FED. R. CIV. P. 15(a). After a responsive pleading is served, "a party may amend only with the opposing party's written consent or the court's leave." *Id.* Rule 15(a) instructs the court to "freely give leave when justice so requires." *Id.* The rule "'evinces a bias in favor of granting leave to amend.'" *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (quoting *Lyn–Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002)). But leave to amend "is not automatic." *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)). Whether to grant leave to amend "lies within the sound discretion of the district court." *Little v. Liquid Air Corp.*, 952 F.2d 841, 845–46 (5th Cir. 1992). A district court reviewing a motion to amend pleadings under Rule 15(a) considers five factors: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the opposing party; and (5) futility of amendment. *Smith v. EMC*, 393 F.3d 590, 595 (5th Cir. 2004) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Rule 16(b)(4) provides that a scheduling order issued by the Court "may be modified only for good cause and with the judge's consent." *See Agredano v. State Farm Lloyds*, No. 5:15-CV-1067-DAE, 2017 WL 5203046, at *1 (W.D. Tex. July 26, 2017) (citing *E.E.O.C. v. Serv. Temps Inc.*,

6

679 F.3d 323, 333–34 (5th Cir. 2012)) (stating, "a party seeking leave to amend its pleadings after a deadline has passed must demonstrate good cause for needing an extension."). "The good cause standard requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *S&W Enters., L.L.C.*, 315 F.3d at 535 (quoting 6A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 1522.1 (2d ed. 1990)). In determining whether good cause exists, courts consider a four-part test: "(1) the explanation for the failure to [timely move for leave to amend]; (2) the importance of the [amendment]; (3) potential prejudice in allowing the [amendment]; and (4) the availability of a continuance to cure such prejudice." *Id.* (quoting *Reliance Ins. Co. v. La. Land & Expl. Co.*, 110 F.3d 253, 257 (5th Cir. 1997)). Only after the movant demonstrates good cause under Rule 16(b)(4) does "the more liberal standard of Rule 15(a)" apply to a party's request for leave to amend. *Id.*

## II.   Compelling Arbitration

Under the Federal Arbitration Act ("FAA"), "parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). The FAA provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA was designed to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (internal quotations omitted). Thus, the FAA establishes "'a liberal federal policy favoring arbitration agreements.'" *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Because arbitration is a creature of

contract, the FAA "requires courts to enforce agreements to arbitrate according to their terms." *CompuCredit*, 565 U.S. at 98 (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

Although there is a strong federal policy favoring arbitration, the policy "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 516 n.5 (5th Cir. 2019) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)). The FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt*, 489 U.S. at 478 (citing *Byrd*, 470 U.S. at 219). Rather, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt*, 489 U.S. at 478 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)

When considering a motion to compel arbitration, courts apply a two-step framework. First, the Court must determine "whether the parties entered into any arbitration agreement at all." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "This first step is a question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims." *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017), *cert. denied*, 584 U.S. 1031 (2018). This initial question is for the Court. *Kubala*, 830 F.3d at 201. To determine whether there is a valid agreement to arbitrate, courts "'apply ordinary state-law principles that govern the formation of contracts.'" *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 939 (1995)).

If the Court finds that there is a valid agreement to arbitrate, it proceeds to the second question: whether the claim at issue is covered by the arbitration agreement. *IQ Prods.*, 871 F.3d at 348. In the second step, the Court must determine "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Webb*, 89 F.3d at 258 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). This second question usually is for the Court, unless the arbitration clause contains a valid delegation clause for an arbitrator to determine whether the claim falls within the arbitration agreement. *Kubala*, 830 F.3d at 201–02.

The party seeking to compel arbitration must prove the existence of an agreement to arbitrate by a preponderance of the evidence. *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012). Once the Court determines that there is a valid agreement to arbitrate, the strong federal policy favoring the enforcement of the arbitration agreements applies, and all ambiguities must be resolved in favor of arbitration. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) (citing *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002)). As the Supreme Court has stated: "'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers*, 363 U.S. at 582–83). Because of the strong presumption in favor of arbitration, the party opposing arbitration bears the burden to show that either the agreement is invalid or that the claims are outside of the agreement's scope. *See Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004).

### III.    Transfer

#### A.    Rules Governing Transfer of Venue

28 U.S.C. § 1391(b) provides, in relevant part, that venue is proper in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; or (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

28 U.S.C. § 1391(b)(1)–(2).

If venue is not proper in the district or division where the case is filed, the case may be dismissed under Federal Rule of Civil Procedure 12(b)(3). Alternatively, under 28 U.S.C. § 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). In deciding a challenge to venue, the Court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Mayfield v. Sallyport Glob. Holdings, Inc.*, No. 6:16-CV-459, 2014 WL 978685, at *1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009)).

#### B.    Enforceability of Forum Selection Clauses

When analyzing the enforceability of forum selection clauses "federal law applies . . . in both diversity and federal question cases." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974)). Federal law governs district courts' decisions "whether to give effect to the parties' forum selection clause. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988). Under federal law, forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the

resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) ("*The Bremen*"). If the forum-selection clause is found to be reasonable, courts must then determine whether the causes of action arise under the forum selection clause. *Ginter ex rel. Ballard v. Belcher, Predergrast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008) (citing *Marinechance Shipping Ltd. v. Sebastian*, 143 F.3d 216, 222–23 (5th Cir. 1998)).

Additionally, courts must also determine whether the forum selection clause is mandatory or permissive. *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127 (5th Cir. 1994). "A party's consent to jurisdiction in one forum does not necessarily waive that party's right to have an action heard in a different forum." *City of New Orleans v. Mun. Admin. Serv., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004); *accord Caldas & Sons*, 17 F.3d at 127. "For a forum selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive." *City of New Orleans*, 376 F.3d at 504 (citing *Keaty v. Freeport Indon., Inc.,* 503 F.2d 955 (5th Cir. 1974)).

The proper way to enforce a mandatory forum selection clause that points to another federal judicial district is by a motion to transfer under 28 U.S.C. § 1404(a), not by a motion to dismiss under 28 USC § 1406(a) or FRCP 12(b)(3). *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 59 (2013). Moreover, § 1404(a) mandates that valid forum selection clauses be given "controlling weight in all but the most exceptional cases." *Id.* at 59–60 (citing *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring)).

When a party challenges venue, the court must therefore determine whether the action falls within one of § 1391(b)'s three categories. *Id.* at 56. If it does, venue is proper in that district; if it does not, venue is improper in that district, and the Court must dismiss the case or transfer it

pursuant to § 1406(a). *Id.* The presence of a forum selection clause in the parties' agreement giving rise to the transaction is irrelevant for purposes of determining whether venue is proper under § 1391(b). *Id.* As a result, "a case filed in a district that falls within § 1391 may not be dismissed under § 1406(a) or Rule 12(b)(3)." *Id.*

### C.    § 1404(a) Transfer Standards

Section 1404 permits a district court to transfer any civil case "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to 'an individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org.*, 487 U.S. at 29 (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). The purpose of § 1404 "is to prevent the waste 'of time, energy and money' and 'to protect the litigants, witnesses and the public against unnecessary inconvenience and expense . . .'" *Van Dusen*, 376 U.S. at 616 (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 27 (1960)).

The threshold inquiry when determining eligibility for transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed," or whether all parties consent to a particular jurisdiction. *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). Once that threshold inquiry is met, the Fifth Circuit has held "[t]he determination of 'convenience' turns on a number of public and private interest factors, none of which can be said to be of dispositive weight." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004).

The private interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of

attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) ("*Volkswagen II*").

The public interest factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Id.* These factors are neither exhaustive nor exclusive, and no single factor is dispositive. *Id.*

The party seeking transfer of venue must show good cause for the transfer. *Id.* The moving party must show that the transferee venue is "clearly more convenient" than the transferor venue. *Id.* The plaintiff's choice of venue is not a factor in this analysis, but rather contributes to the defendant's burden to show good cause for the transfer. *Id.* at 315 n.10 ("[W]hile a plaintiff has the privilege of filing his claims in any judicial division appropriate under the general venue statute, § 1404(a) tempers the effects of the exercise of this privilege."). However, "when the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Id.* at 315. And while the multi-factor analysis is informative, ultimately, "the district court has broad discretion in deciding whether to order a transfer." *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1998) (quoting *Caldwell v. Palmetto State Sav. Bank*, 811 F.2d 916, 919 (5th Cir. 1987)).

## ANALYSIS

The current dispute regarding arbitration has created a case within a case. What began as a lawsuit alleging industry wide conspiracy, fraud, theft, and misconduct, has become a wholly

separate and distinct lawsuit regarding the propriety of arbitration. Over the course of less than a year, the Court's docket has over one hundred filings related to the pending arbitration dispute. To resist arbitration, Plaintiff not only raised a variety of constitutional challenges to the SEC-FINRA framework, but he also seeks to turn those defenses into a nationwide class action (Dkt. #36; Dkt. #94; Dkt. #96; Dkt. #100; Dkt. #143; Dkt. #144). Despite seeking relief in the nationwide class action to invalidate the SEC approved FINRA arbitration framework, Plaintiff maintains his individual claims against Defendants for money laundering, RICO violations, fraud, and breach of fiduciary duty (*See* Dkt. #1; Dkt. #144). Due to the interrelated nature of the filings, the Court must dispose of all of the pending matters on its docket in one fell swoop.

In Section I, the Court will first provide an overview of the relevant statutory framework and background regarding the SEC-FINRA relationship. Then, in Section II, the Court will determine whether Plaintiff should be granted leave to amend his Complaint to include the nationwide class action. Should Plaintiff be granted leave to amend, arbitration cannot be compelled based on the terms of those agreements. However, the Court does not find leave should be granted. Thus, the Court must proceed, in Section III, to determine whether valid and enforceable arbitration agreements exist. As to Merrill Lynch, Deutsche Bank, and Charles Schwab, they do. In Section IV, the Court will address Plaintiff's litany of defenses against arbitration. Ultimately, none of them succeed and the Court finds that it should compel arbitration as to Merrill Lynch, Deutsche Bank, and Charles Schwab. In contrast to the other Defendants, Morgan Stanley does not have a mandatory arbitration agreement; instead, it has one that permits Plaintiff to elect arbitration or litigation. Given Plaintiff's conduct thus far, the Court ultimately deems that Plaintiff elected litigation. As Plaintiff elected litigation, the Court will proceed to

Section V, which evaluates Morgan Stanley's Motion to sever the claims against it and to transfer those claims to the United States District Court for the Southern District of New York. The Court finds that Morgan Stanley's Motion should be granted and will sever and transfer.

## I.    Background and Framework of the SEC-FINRA Relationship

A self-regulatory organization ("SRO") is any national securities exchange, registered securities association, or registered clearing agency established by law. 79A C.J.S. *Securities* § 193 (2025) (citing 15 U.S.C. § 78c(a)(26)). SROs seek to ensure that their members comply with federal securities laws and the SRO's own regulations, which are designed to promote ethical business behavior. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nat. Ass'n of Sec. Dealers, Inc.*, 616 F.2d 1363, 1365 (5th Cir. 1980); 108 AM. JUR. *Trials* 313 § 3 (2008). The Securities Exchange Act of 1934 "granted cooperative organizations of investment bankers, dealers and brokers self-regulatory authority over their own members in order to attain and preserve the highest standards of legal and ethical behavior in the nation's securities markets." *Merrill Lynch*, 616 F.2d at 1366. "Self-regulation was believed to have many significant benefits, including 'the expertise and intimate familiarity with complex securities operations which members of the industry can bring to bear on regulatory problems, and the informality and flexibility of self-regulatory procedures.'" *Id.* (quoting Rep. of the Subcomm. on Sec. of the S. Comm. on Banking, Hous. and Urb. Affs., Sec. Indus. Study, S. Doc. No. 93-13, 93d Cong., 1st Sess. 149 (1973)).

Unsurprisingly, SROs have exercised substantial market authority. *Alliance*, 125 F.4th at 164. To ensure that SROs comport with public interest, Congress amended the Exchange Act in 1975, which requires SROs to receive SEC approval for any rule changes or additions. *Id.* Since the 1975 amendments, the SEC has had "expansive power to ensure the adequacy of the arbitration procedures employed by the SROs," and the SEC has the power, on its own initiative, to

"'abrogate, add to, and delete from, any SRO rule if it finds such changes necessary or appropriate to further the objectives of the Act.'" *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 233 (1987) (quoting 15 U.S.C. § 78s(c)). FINRA is an SRO formed under the Exchange Act and was created in 2007 following the consolidation of the National Association of Securities Dealers, Inc. ("NASD") and portions of the New York Stock Exchange Regulations, Inc. ("NYSE"). 79A C.J.S. *Securities* § 193 (2025) (citing *Birkelbach v. S.E.C.*, 751 F.3d 472 (7th Cir. 2014)). With this background in mind, the Court will proceed to discuss the issues raised by Plaintiff.

## II.    Leave to Amend

The Court will begin by evaluating Plaintiff's Motion for Leave to Amend his Complaint (Dkt. #143). Notably, Plaintiff does not seek to amend any of his individual claims or the facts underlying them, instead he seeks to transform his various defenses to arbitration into a nationwide class action that would declare the SEC-FINRA arbitration model unconstitutional and untenable (*Compare* Dkt. #1, *with* Dkt. #144). Specifically, Plaintiff seeks to turn his litigation into a class action lawsuit that challenges the constitutionality and propriety of FINRA as an arbitral body, FINRA's arbitration procedures, and the arbitration clauses it mandates FINRA members include in contracts with their customers (*See* Dkt. #144 at ¶¶ 551–90).

In the Fifth Circuit, the determination of whether to grant leave to amend "lies within the sound discretion of the district court." *Little*, 952 F.2d at 845–46. To determine the propriety of granting leave to amend, the Court analyzes five factors: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the opposing party; and (5) futility of amendment. *Smith*, 393 F.3d at 595. If the Court finds any one of these factors, it can deny leave to amend. *Hurt v. Comenity Cap. Bank*, No. 25-CV-00555, 2025 WL 2049284, at *1 (E.D. Tex. July 21, 2025) (citing *Jack v. Evonik Corp.*, 79 F.4th 547,

564–65 (5th Cir. 2023)); *WTW Inv. Co., Ltd. v. Jefferies, LLC*, No. 3:17-CV-00332, 2020 WL 406941, at *1 (N.D. Tex. Jan. 24, 2020) (citing *Foman*, 371 U.S. at 182). As this is Plaintiff's first Motion for Leave to Amend, factor three is inapplicable. The Court will evaluate the remaining four factors in turn. Ultimately, the Court finds that the four remaining factors weigh against granting Plaintiff leave to amend.

### A.    Undue Delay

When evaluating whether leave to amend should be denied, the Court can consider the undue delay in seeking leave to amend. *Robertson v. Intratek Comput., Inc.*, 976 F.3d 575, 584 (5th Cir. 2020). Under Rule 15(a), a motion for leave to amend is presumptively timely when it is filed before the deadline set out in the Court's Scheduling Order. *Cinemark Holdings, Inc. v. Factory Mut. Ins. Co.*, No. 4:21-CV-00011, 2021 WL 3190508, at *2 (E.D. Tex. July 28, 2021). However, the presumption can be overcome when the Court evaluates the explanation for the delay, timing of the request for leave, and the context surrounding the motion. *See Jacobs v. United Rev. Corp.*, No. 4:18-CV-810-A, 2018 WL 6523885, at *1 (N.D. Tex. Dec. 11, 2018) (citing *Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, 88 F.3d 311, 316 (5th Cir. 1996)). While a delay itself is not enough to deny leave to amend, an *undue* delay in conjunction with the other factors is sufficient to warrant denial under Rule 15. *Mayeaux v. La. Health Serv. and Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004) ("The delay must be *undue*, i.e., it must prejudice the nonmoving party or impose unwarranted burdens on the court."). Further, when evaluating a delay, the Court "can examine the context of a party's request for leave to amend to determine the party's underlying motive in seeking leave." *Priester v. Deutsche Bank Nat. Trust Co.*, No. 4:16-CV-449, 2017 WL 2821715, at *7 (E.D. Tex. June 30, 2017) (citing *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139–42 (5th Cir. 1993)). "The district court also may consider 'whether the facts underlying the amended

complaint were known to the party when the original complaint was filed.'" *Robertson*, 976 F.3d at 584 (quoting *Southmark*, 88 F.3d at 316); *Wimm*, 3 F.3d at 139–42.

With these standards in mind, the Court finds that Plaintiff unduly delayed in seeking to add five class action claims, solely reiterating his defenses to the various arbitration agreements he signed. First, the Court notes that the proposed Amended Complaint does not allege any new facts, nor do the class action claims relate, in any way, to Plaintiff's individual claims (*See* Dkt. #1; Dkt. #144). In essence, the additional class action claims will turn a single action into two different lawsuits, with no relation to each other. One, based on Plaintiff's individual claims, seeks financial compensation for the alleged tortious and illegal actions of Defendants (Dkt. #144 at ¶¶ 551–90). The other would add a nationwide class of plaintiffs who seek to challenge the constitutionality and propriety of arbitration agreements based on FINRA as an arbitral forum, FINRA's arbitration procedures, and the SEC's authority, or lack thereof, to approve of FINRA arbitral procedures (Dkt. #144 at ¶¶ 551–90).

Second, as previously noted, the Amended Complaint relies on the same facts as the Original Complaint (*Compare* Dkt. #1, *with* Dkt. #144). Plaintiff's explanation for the similarity is that he had no way of knowing that Defendants would seek to compel arbitration under the agreements, and thus he had no way of knowing that a class action would be appropriate when he filed his Original Complaint (Dkt. #167 at p. 7). Even assuming this argument is correct, it still does not support Plaintiff's delay in seeking to further expand the lawsuit into a class action over the propriety of FINRA arbitration. Plaintiff's class action is a blatant attempt to repackage his arguments against arbitration (*Compare* Dkt. #36; Dkt. #94; Dkt. #96; Dkt. #100, *with* Dkt. #144 at ¶¶ 551–90). Plaintiff was aware of the conditions to assert his class action as early as July 16,

2024, when Merrill Lynch filed its Motion to Compel Arbitration, or as late as August 6, 2024, when he filed his Response to that Motion. Thus, at best, Plaintiff waited between five and six months before seeking leave to amend to add class action claims, with no explanation of that delay.

Third, and most important, is the timing of Plaintiff's request for leave to amend. After months of litigation over whether Plaintiff should be compelled to arbitrate, the Court set a hearing on Defendants' Motion for a Stay of Discovery (Dkt. #115). A few days before that hearing, Plaintiff filed his Motion for Leave to Amend, in which he claims that the class action will moot each Defendant's Motion to Compel Arbitration and the stay of discovery (*See* Dkt. #143). Further, at the hearing on the Motions to Stay, Plaintiff initially tried to use his Motion for Leave as a shield against granting the stay (Dkt. #150 at pp. 33–34). At the hearing, the Court asked if the Amended Complaint was mere gamesmanship in an attempt to avoid arbitration (Dkt. #150 at pp. 39–40). While Plaintiff avers that the Amended Complaint is not gamesmanship or a tactical move, he does not address these concerns in his Reply (*See* Dkt. #167). Ultimately, the Court finds that the context surrounding Plaintiff's Motion for Leave, especially when examined with his express desire to destroy the arbitrability of the claims, leads to only one conclusion—Plaintiff is employing his Motion for Leave as a tactical maneuver to avoid arbitration. *See Robertson*, 976 F.3d at 584. Such an attempt counsels toward finding undue delay as Plaintiff could have asserted his class claims much earlier but waited to do so until the week of a hearing on Defendants' Motions to Stay until resolution of the Motions to Compel Arbitration.

### B.      Bad Faith or Dilatory Motive

Similar to undue delay, when the Court considers bad faith it should examine whether Plaintiff was aware of the facts supporting his new claims earlier but waited to assert those claims until a motion to compel arbitration was imminent. *See Wimm*, 3 F.3d at 141; *Corp. Relocation, Inc.*

*v. Martin*, No. 3:06-CV-232-L, 2006 WL 4101944, at *5 (N.D. Tex. Sept. 12, 2006) (denying leave to amend because the new claims were "a tactical maneuver to avert the real possibility that this action will be compelled to arbitration."). Further, the Court should evaluate the overall context of the Motion for Leave to determine the motive for seeking leave. *Priester*, 2017 WL 2821715, at *7 (citing *Wimm*, 3 F.3d at 139–42). In addition to the suspect timing of Plaintiff's filing, the Court finds Plaintiff's purpose for seeking leave as a reason to find bad faith:

1. "Because Plaintiff brings a class action, Defendants are barred under their own contracts and under FINRA Rules from moving for arbitration . . . ." (Dkt. #143 at p. 2).

2. "[I]f the Court grants Plaintiff's request to amend, it need not reach Defendant's arbitration motions and should deny them . . . ." (Dkt. #143 at p. 2).

3. "[T]he allegations in the Amended Complaint will streamline this litigation, as the requests for declaratory relief on a classwide basis as to the statutory authority for FINRA's rules and the constitutionality of SEC approval of FINRA rules will also render Mr. Mansour's individual claims ineligible for arbitration under the agreements relied upon by Defendants." (Dkt. #143 at p. 3–4).

4. "The proposed class claims were already discussed in Mr. Mansour's opposition to the Defendants' motions to dismiss and/or compel arbitration, and should resolve the arbitration issue because Mr. Mansour's suit will no longer be eligible for arbitration before FINRA." (Dkt. #143 at p. 4).

5. "[A]djudication of [the class action] claims . . . would have been required as [they are] defenses to arbitration . . . ." (Dkt. #143 at p. 4).

It is clear to the Court, based on Plaintiff's repeated statements in his Motion for Leave, that he had a singular motive in adding class action claims—to avoid arbitration. This type of tactical maneuvering is exactly the type of gamesmanship that that warrants denying leave to amend. *See Robertson*, 976 F.3d at 584. The Court could end its analysis here; however, other issues support denial of Plaintiff's Motion for Leave.

20

### C.    Undue Prejudice to Opposing Parties

When examining prejudice, the Fifth Circuit examines whether the proposed amendment "(1) was merely proposing alternative legal theories for recovery on the same underlying facts or (2) would fundamentally change the nature of the case." *Mayeaux*, 376 F.3d at 427. "Amendments that fall into the former category generally should be permitted, as they advance Rule 15(a)'s policy of promoting litigation on the merits rather than on procedural technicalities." *Id.* "Amendments that fall into the latter category, however, may be denied if the circumstances warrant." *Id.*

In this case, the Court finds that permitting Plaintiff to amend his Complaint would unduly prejudice Defendants. It is evident that the additional class claims would fundamentally change the nature of the case. Plaintiff's Original Complaint alleges theories of money laundering, conversion, breach of fiduciary duty, fraud, and civil RICO violations (*See* Dkt. #1). The Amended Complaint, based on the same facts, expands the suit to include a separate nationwide class action, solely focused on the propriety of the arbitration agreements used by Defendants as FINRA members (*See* Dkt. #144 at ¶¶ 565–90). Thus, the lawsuit would take on a different form as the litigation would necessarily require a significant detour through the various class action procedures listed in Federal Rule of Civil Procedure 23. Additionally, the lawsuit would then have a split focus between Plaintiff's individual claims against Defendants, which are entirely separate and distinct from the proposed class action claims based on the actions of non-present entities (FINRA and the SEC). The Court finds that the prejudice to Defendants is clear. *See Mayeaux*, 376 F.3d at 427; *Westbrook v. Advanced Solids Control, LLC*, No. 2:14-CV-131, 2015 WL 4389044, at *3 (S.D. Tex. July 15, 2015); *Ducharme v. Crescent City Déjà Vu, L.L.C.*, No. 18-4484, 2019 WL 13273278, at *8 (E.D. La. May 15, 2019) (denying leave to amend where the plaintiff sought to convert the lawsuit into a class action based on the prejudice to the defendants). Additionally, the Court finds that

21

Defendants would be prejudiced by their position in the class action. Inherently, Plaintiff's class claims would require Defendants to stand in the shoes of the SEC and FINRA to defend their policies and rulemaking authority. Such a position is prejudicial to Defendants who did not propose, and do not enforce, FINRA policies.[2]

### D.    Futility

The Court also finds that Plaintiff's proposed amendment would be futile. Plaintiff's class action seeks to turn his defenses against arbitration into a nationwide class action (*See* Dkt. #1; Dkt. #144). As will be discussed in Section IV, none of these defenses pass muster. As the defenses themselves fail, any amendment predicated on the same grounds would also fail. Thus, the Court finds that four of the factors counsel against granting leave to amend. Accordingly, the Court finds that Plaintiff's Motion for Leave to Amend should be denied.

## III.    Arbitration Agreements

Merrill Lynch, Deutsche Bank, and Charles Schwab all moved to compel arbitration with Plaintiff, pursuant to the agreements he signed with them (*See* Dkt. #32; Dkt. #46; Dkt. #47). Plaintiff challenges the propriety of the arbitration agreements in two different ways. First, he lodges individual challenges to the validity of the agreements. Second, he presents a litany of defenses against the enforceability of the agreements. The Court will begin by addressing whether valid agreements to arbitrate exist. However, the Court notes that Plaintiff does not challenge the formation or validity of his agreement with Charles Schwab (*See* Dkt. #100). Thus, the Court will only address the scope of the Charles Schwab agreement in Section III.C. Ultimately, the Court

---

[2] The Court also notes that an intervention by the SEC and FINRA may be required if it were to grant leave to amend.

finds that all of the arbitration agreements are valid contracts. Thus, the Court will turn to Plaintiff's challenges to the enforceability of those Agreements in Section IV.

## A.    Merrill Lynch

Before examining the validity of the Merrill Lynch agreements, the Court must determine what state's law provides the relevant contract interpretation principles. To determine whether parties agreed to arbitrate a certain matter, courts apply the contract law of the state that governs the agreement. *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citing *Kaplan*, 514 U.S. at 944). When a case arises under a court's federal question jurisdiction, the Court must apply federal common law choice-of-law principles to determine the law of the state that will apply. *Haynsworth v. The Corporation*, 121 F.3d 956, 962 (5th Cir. 1997). Under federal common law, the Court must give effect to a choice-of-law provision unless a party shows that the clause is "unreasonable under the circumstances." *Edwards v. Doordash, Inc.*, No. H-16-2255, 2016 WL 7852532, at *5–6 (S.D. Tex. Dec. 8, 2016) (citing *Ginter ex rel. Ballard v. Belcher, Predergast & Laporte*, 536 F.3d 439, 449 (5th Cir. 2008) (Dennis, J., dissenting); *Mitsui & Co. (USA), Inc. v. Mira M/V*, 111 F.3d 33, 35 (5th Cir. 1997)).

In its Motion to Compel Arbitration, Merrill Lynch produces two agreements containing arbitration and choice of law clauses: a 2007 Account Agreement and a 2011 Personal Investment Advisory Account Agreement (Dkt. #32; Dkt. #32-1). Plaintiff's primary argument against the validity of the 2007 Agreement is that it does not contain the attached terms, thus it is invalid (Dkt. #36 at pp. 19–23). According to Plaintiff, Merrill Lynch has not established the contents of the 2007 Agreement because it only attached the signed signature page from the 2007 Agreement and a separate, unsigned form Client Relationship Agreement that provides the terms of arbitration (Dkt. #36 at pp. 19–23; *compare* Dkt. #32-1 at pp. 5, *with* Dkt. #32-1 at pp. 7–14). To Plaintiff,

attaching the signature page and a separate form is not sufficient to establish the terms of the 2007 Agreement (Dkt. #36 at pp. 19–23). Second, he challenges the 2011 Agreement by arguing that the signature on the 2011 Agreement is a forgery (Dkt. #36 at pp. 19–23). Thus, he argues that the Court must conduct a jury trial to determine whether the 2011 Agreement is valid (Dkt. #36 at pp. 19–23). The Court will begin by determining whether the 2007 Agreement incorporates the New York choice of law clause, as Merrill Lynch argues (Dkt. #32 at pp. 6, 11).[3]

Under federal common law in the Fifth Circuit, "'where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together.'" *Rolls v. Packing Corp. of Am. Inc.*, 34 F.4th 431, 440 (5th Cir. 2022) (quoting *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267–68 (5th Cir. 2011)). "Terms incorporated by reference will be valid so long as it is clear that the parties to the agreement had knowledge and assented to the incorporated terms, which is reasonable where, under the particular facts of the case, a reasonably prudent person should have seen them." *Id.* (internal quotations omitted).

Here, the 2007 Agreement incorporated the terms from the form Client Relationship Agreement (Dkt. #32-1 at p. 5) ("By signing below, I agree to the terms of the Merrill Lynch Client Relationship Agreement"). First, the signature page states that Plaintiff agreed to the terms of the Client Relationship Agreement (Dkt. #32-1 at p. 5). Second, the bottom right corner of the signature page has a document code: "Code 100296RR-0507" (*See* Dkt. #32-1 at p. 5). This code is also on the bottom right corner of the form Client Relationship Agreement (*See* Dkt. #32-1 at

---

[3] Plaintiff does not provide any argument as to what law applies to interpret the 2007 Agreement (*See* Dkt. #36; Dkt. #74)

pp. 7–14). Thus, the Court finds that Plaintiff had knowledge of and assented to the incorporated terms as a reasonably prudent person would have reviewed the Client Relationship Agreement to understand the terms incorporated by reference. The 2007 Agreement includes a choice of law clause selecting New York law (Dkt. #32-1 at p. 5) ("New York law governs your agreements and transactions unless we indicate otherwise."). Accordingly, the Court will apply New York law to determine what arbitration terms Plaintiff agreed to. *See id.*; *Edwards*, 2016 WL 7852532, at *5–6 (citing *Overstreet v. Contigroup Companies, Inc.*, 462 F.3d 409, 411 (5th Cir. 2006)).

Having determined that the 2007 Agreement incorporated the New York choice of law clause under federal common law, the Court must now determine whether the 2007 Agreement incorporates the arbitration terms under New York law. It does. Thus, as the Court finds that the 2007 Agreement controls, it need not address Plaintiff's claims of forgery. The Court will begin by analyzing the 2007 Agreement and whether it incorporates the specific terms for arbitration.

"It is a longstanding principle in New York contract law that 'he who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them.'" *Nardi v. Povich*, 824 N.Y.S.2d 764, 2006 WL 2127714, at *7 (N.Y. App. Div. 2006) (quoting *Level Exp. Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82, 87 (N.Y. 1953)) (holding that a buyer was bound by standard terms incorporated by reference into an executed agreement despite claiming it had never seen or received a copy of those terms and was unaware of the arbitration agreement). Here, the 2007 Client Relationship Agreement signature page includes the following provisions: "I agree to the terms of the Merrill Lynch Client Relationship Agreement on the reverse side and . . . that, in accordance with section 8, page 2 of the Client Relationship Agreement, I am agreeing in advance

to arbitrate any controversies that may arise with you." (Dkt. #32-1 at p. 5). The provisions are located directly above Plaintiff's signature (*See* Dkt. #32-1 at p. 5). Plaintiff, for his part, admits that he signed the agreement, although he disputes that the terms of the Client Relationship Agreement were given to him (Dkt. #32 at pp. 16–18, 22–23; Dkt. #38).

While Plaintiff claims he does not remember signing the document, nor reading the full Client Relationship Agreement, the Court finds that Merrill Lynch has provided sufficient evidence to establish that Plaintiff agreed to arbitrate under the provisions of the Client Relationship Agreement. First, the signature page states that Plaintiff agreed to the terms of the Client Relationship Agreement (Dkt. #32-1 at p. 5). Furthermore, the signature page expressly states that Plaintiff agreed to arbitrate "any controversies" that arose between himself and Merrill Lynch (Dkt. #32-1). Thus, even if Plaintiff does not remember what he agreed to, his signature unambiguously shows that he agreed to arbitrate according to "Section 8, Page 2" of the Client Relationship Agreement (Dkt. #32-1 at p. 5).

Second, the bottom right corner of the signature page has a document code: "Code 100296RR-0507" (*See* Dkt. #32-1 at p. 5). This code is also on the bottom right corner of the form Client Relationship Agreement (*See* Dkt. #32-1 at pp. 7–14). Notably, the document code number is on page two of the Terms and Conditions of the Client Relationship Agreement—the same page with the terms and conditions for arbitration (*See* Dkt. #32-1 at p. 13). Further, even if Plaintiff did not receive a copy of the Client Relationship Agreement "it was [his] responsibility to ensure that [he] understood the document that he signed." *Nardi*, 824 N.Y.S.2d 764, 2006 WL 2127714, at *7 (citing *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 146–49 (2d Cir. 2004)). Thus, the Court is convinced that the signature page's reference to the Client Relationship Agreement is one and

the same as the form agreement, which outlines the terms of arbitration (Dkt. #32-1 at p. 13). Therefore, the Court finds that the 2007 Account Agreement signature page incorporates the terms of the form Client Relationship Agreement and that Plaintiff is bound by those provisions as they were incorporated by reference.

Additionally, Plaintiff challenges Merrill Lynch's selection of FINRA as an arbitral forum because the 2007 agreement states that arbitration will occur at one of three places: (1) the New York Stock Exchange, Inc., (2) an arbitration facility provided by any other exchange of which Merrill Lynch is a member, or (3) the National Association of Securities Dealers, Inc. (Dkt. #32-1 at pp. 5, 13). Plaintiff claims arbitration is impossible because NASD and NYSE no longer exist (Dkt. #36 at pp. 16, 21–22). While Plaintiff is correct that NASD and NYSE no longer exist, courts routinely substitute FINRA (NASD's successor) as the appropriate arbitral forum. *See, e.g.*, *Baker Hughes Saudi Arabia Co. Ltd. v. Dynamic Indus. Inc.*, 126 F.4th 1073, 1089 (5th Cir. 2025) (citing *Lewis v. UBS Fin. Servs. Inc.*, 818 F. Supp. 2d 1161, 1164 (N.D. Cal. 2011)); *G.distributors, LLC v. Scanlon*, No. 18-CV-02101, 2018 WL 6329444, at *5 (S.D.N.Y. Dec. 3, 2018); *In re H&R Block Fin. Advisors, Inc.*, 262 S.W.3d 896, 900 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("[C]ourts continue to enforce NYSE or NASD arbitration clauses by referring parties to FINRA arbitration."). Accordingly, the Court finds that FINRA is an appropriate arbitral forum under the 2007 Agreement. Thus, the Court need not reach Plaintiff's allegations of forgery as discovery is inappropriate based on the earlier agreement to arbitrate "any controversies" with Merrill Lynch in FINRA arbitration.

## B.    Deutsche Bank

Deutsche Bank moved to compel arbitration on an Account Agreement it had with Plaintiff (Dkt. #46; Dkt. #46-2). Plaintiff argues that the arbitration agreement in the Account Agreement

does not control this dispute because it was superseded by subsequent Loan Agreements Plaintiff entered with Deutsche Bank (Dkt. #96 at pp. 12-14; Dkt. #96-2; Dkt. #96-3). The Loan Agreements contain a forum selection clause that waives a jury trial and provides that all litigation must take place in New York (Dkt. #96-2 at pp. 5–6; Dkt. #96-3 at pp. 6–7). According to Plaintiff, the subsequent Loan Agreements amended the Account Agreement to write out the arbitration clause (*See* Dkt. #96 at pp. 12–14). Plaintiff is incorrect.

Before turning to the which Agreement controls the dispute, the Court must determine what state law of contract interpretation applies. *Bailey*, 364 F.3d at 264 (citing *Kaplan*, 514 U.S. at 944). When a case arises under a court's federal question jurisdiction, the Court must apply federal common law choice-of-law principles to determine the law of the state that will apply. *Haynsworth*, 121 F.3d at 962. Under federal common law, the Court must give effect to a choice-of-law provision unless a party shows that the clause is "unreasonable under the circumstances." *Edwards*, 2016 WL 7852532, at *5–6 (citing *Ginter*, 536 F.3d at 449; *Mitsui*, 111 F.3d at 35). Here, all of the Agreements contain a New York choice of law clause (Dkt. #46-2 at p. 5) (Account Agreement) ("This Agreement shall be deemed to have been made in the State of New York and shall be construed . . . in accordance with the laws of the State of New York"); (Dkt. #96-2 at p.6; Dkt. #96-3 at p. 8) (Loan Agreements) ("This Agreement shall be construed in accordance with and be governed by the law of the state of New York"). Further, Plaintiff does not argue that the application of New York law is unreasonable under the circumstances (*See* Dkt. #96; Dkt. #139). Thus, the Court will apply New York law to determine which Agreement controls. *Edwards*, 2016 WL 7852532, at *5–6 (citing *Overstreet*, 462 F.3d at 411).

Whether an arbitration agreement can be superseded by a later agreement presents a general question of contract interpretation under New York law. *528-538 W. 159th St. LLC v. Soloff Mgmt. Corp.*, 910 N.Y.S.2d 762, 2010 WL 1756862, at *4 (N.Y. Sup. Ct. 2010). "[P]arties to an arbitration agreement 'are free to enlarge, restrict, modify, amend, or terminate their agreement to arbitrate.'" *Wolf v. Wahba*, 164 A.D.3d 1405, 1407 (N.Y. App. Div. 2018) (quoting *Matter of Instituto De Resseguros Do Brasil v. First State Ins. Co.*, 221 A.D.2d 266, 266 (N.Y. App. Div. 1995)). However, when a second agreement can be construed in harmony with the original agreement, there is no need to alter the original. *Intercontinental Packaging Co. v. China Nat. Cereals, Oils & Foodstuff Imp. & Exp. Co.*, 159 A.D.2d 190, 195 (N.Y. App. Div. 1990).

Here, Plaintiff entered into a broad arbitration agreement with Deutsche Bank (Dkt. #46-1 at p. 5) ("I agree to arbitrate with you any controversies which may arise . . . including any controversy arising out of or relating to any account with you."). Later, he entered into multiple Loan Agreements that do not require arbitration for disputes arising out of those loans (Dkt. #96-2 at pp. 5–6; Dkt. #96-3 at pp. 6–7). While Plaintiff argues that the Loan Agreements supersede the Account Agreement, the Court finds that the agreements can be read in harmony. *See Intercontinental Packaging*, 159 A.D. at 195; *Primex Intern. Corp. v. Wal-Mart Stores, Inc.*, 98 N.Y.2d 594, 599–602 (N.Y. 1997). Nothing in the Loan Agreement states that they override or supersede the arbitration agreements found in the Account Agreement (*Compare* Dkt. #94-1, with Dkt. #96-2; Dkt. #96-3).[4] Instead, the Loan Agreements apply to the narrower set of circumstances for disputes arising out of or relating to those agreements only (Dkt. #96-2 at p. 5;

---

[4] The Court notes that Plaintiff's argument is less convincing because he did not even attempt to comply with the forum selected by the Loan Agreements ("the Courts of the State of New York, and the federal courts in New York City") but instead filed here in violation of the very clauses he seeks to use to avoid arbitration (Dkt. #96-2 at p. 5; Dkt. #96-3 at p. 6).

Dkt. #96-3 at p. 6). Thus, while a suit only arising out of or relating to the Loan Agreements would be subject to those forum selection clauses, a suit regarding Plaintiff's accounts subjects the case to the arbitration agreement. Here, Plaintiff's claims relate to all actions Deutsche Bank took with regard to his accounts, not just the loans (*See* Dkt. #1 at ¶¶ 304–44, 588–617). Thus, the Account Agreement controls the current dispute, as Plaintiff's claims involve conduct outside of the loans he received (*See* Dkt. #1 at ¶¶ 304–44, 588–617).

Another reason further supports the Court's harmonious reading of the Agreements. A subsequent agreement will supersede a prior agreement only when both agreements speak to the same subject matter. *Mayers v. Stone Castle Partners, LLC*, 988 N.Y.S.D.2d 523, 2014 WL 702116, at *6 (N.Y. Sup. Ct. 2014) (citing *Kramer v. Danalis*, 49 A.D.3d 263 (N.Y. App. Div. 2008)) ("when the new agreement does not cover the subject of the parties' prior negotiated issues, the new agreement does not subsume the prior agreement."); *see also Primex*, 98 N.Y.2d at 599–602. Here, the Loan Agreements only apply to the loans offered under those agreements and do not speak to the subject matter of the Account Agreement, which governs much of the conduct at issue in this case (*Compare* Dkt. #46-2, *with* Dkt. #96-2; Dkt. #96-3). Thus, the Loan Agreements do not speak to the same subjects as the Account Agreement. Accordingly, the arbitration clause in the Account Agreement controls Plaintiff's claims against Deutsche Bank.

Plaintiff also argues that Deutsche Bank's claims are not arbitrable because the Agreements select NASD or NYSE as arbitral forums, not FINRA (Dkt. #96 at p. 14). The Court disposed of this argument when discussing Merrill Lynch's Motion to Compel Arbitration. *See supra* Section III.A. FINRA is the substitute for NASD and NYSE. *See, e.g.*, *Baker Hughes*, 126 F.4th at 1089; *Lewis*, 818 F. Supp. 2d at 1164; *G.distributors*, 2018 WL 6329444, at *5; *In re H&R Block*, 262

S.W.3d at 900. Thus, FINRA is an appropriate arbitral body. *See supra* Section III.A. Accordingly, Plaintiff and Deutsche Bank entered a valid arbitration agreement that covers the current dispute.

### C.     Charles Schwab

Charles Schwab moves to compel arbitration under multiple agreements (Dkt. #47; Dkt. #47-2 at p. 5; Dkt. #47-3 at p. 7; Dkt. #47-4 at pp. 54–55; Dkt. #47-6 at p. 13; Dkt. #47-9 at p. 18; Dkt. #47-10 at p. 42; Dkt. #47-13 at p. 42; Dkt. #47-15 at p. 12; Dkt. #47-16 at p. 42). Those agreements contain a California choice of law clause, so the Court will apply California law to determine the validity of the agreement, as Plaintiff does not challenge the choice of law provisions (*See, e.g.*, Dkt. #47-4 at p. 53) ("This Agreement, and all future agreements . . . shall be governed by the law . . . of the State of California."). *Edwards*, 2016 WL 7852532, at *5–6 (citing *Overstreet*, 462 F.3d at 411). Under California law, "a written agreement to submit a controversy to arbitration is valid, enforceable, and irrevocable, 'save upon such grounds as exist for the revocation of any contract.'" *Ramirez v. Charter Commc'ns, Inc.*, 551 P.3d 520, 529 (Cal. 2024) (citing CAL. CODE CIV. PRO. § 1281). Here, there is a written contract to arbitrate all disputes, including the arbitrability of the dispute, and Plaintiff does not assert any ground to revoke the contract with Charles Schwab (*See, e.g.*, Dkt. #74-4 at pp. 54–55; *see also* Dkt. #100). Therefore, the Court finds that Plaintiff entered into valid arbitration agreements with Charles Schwab. The next question is whether those agreements cover Plaintiff's claims against Charles Schwab.

The Supreme Court has instructed courts to look no further than the arbitrability of a particular claim when determining whether to compel arbitration. Indeed, "courts must examine a complaint with care to assess whether any individual claim must be arbitrated," and "[t]he failure to do so is subject to immediate review." *KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (2011). However, "parties may agree that the 'gateway' question of arbitrability should be decided by an arbitrator,

rather than a court." *See Beaumont Foot Specialists, Inc. v. United Healthcare of Tex., Inc.*, No. 1:15-CV-216, 2015 WL 9703796, at \*2 (E.D. Tex. Dec. 22, 2015), *report and recommendation adopted*, No. 1:15-CV-216, 2016 WL 165023 (E.D. Tex. Jan. 14, 2016) (citing *Rent–A–Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). "Pursuant to such a 'delegation' clause, an arbitrator is empowered to determine whether the agreement in fact requires the parties to arbitrate the dispute at hand." *Id.* (citing *Rent–A–Ctr.*, 561 U.S. at 68–69). "[This] is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019).

In *Rent–A–Center*, the plaintiff argued that because he was required to sign the arbitration agreement as a condition of his employment, the agreement was unconscionable. 561 U.S. at 68–69. The agreement contained the following delegation clause:

> The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including, but not limited to any claim that all or any part of this Agreement is void or voidable.

*Id.* at 66. The Supreme Court held that, pursuant to the delegation clause, "any challenge to the validity of the Agreement as a whole [should be left] for the arbitrator." *Id.* at 72.

Here, the Charles Schwab arbitration agreements contain the following provision:

> Any controversy or claim arising out of or relating to (i) this Agreement, any other agreement with Schwab, an instruction or authorization provided to Schwab or the breach of any such agreements, instructions or authorizations; (ii) the Account, any other Schwab account or Services; (iii) transactions in the Account or any other Schwab account; (iv) or in any way arising from the relationship with Schwab, its parent, subsidiaries, affiliates, officers, directors, employees, agents or service providers, *including any controversy over the arbitrability of a dispute, will be settled by arbitration.*

(Dkt. #47-2 at p. 5; Dkt. #47-3 at p. 7; Dkt. #47-4 at pp. 54–55; Dkt. #47-6 at p. 13; Dkt. #47-9 at p. 18; Dkt. #47-10 at p. 42; Dkt. #47-13 at p. 42; Dkt. #47-15 at p. 12; Dkt. #47-16 at p. 42)

(emphasis added). Plaintiff does not challenge his assent to the agreements, nor does he argue that the provisions do not delegate the issue of arbitrability to the arbitrator (*See* Dkt. #100). *See Lower, LLC v. Amcap Mortg., Ltd.*, No. 4:23-cv-685, 2024 WL 2784326, at *6 (E.D. Tex. May 30, 2024); s*ee also Van Buren v. Pro Se Plan., Inc.*, No. 14-2099, 2014 WL 6485653, at *5 (E.D. La. Nov. 18, 2014) ("[T]he Plaintiff's failure to articulate a specific challenge to the delegation clause requires the Court to abstain from deciding the merits of any dispute concerning enforceability of the arbitration agreement or the underlying contract and refer the matter to arbitration."). Plaintiff's only argument against the viability of the arbitration clause itself is that the FINRA rules have a six-year limitation period (Dkt. #100 at p. 10). However, that argument raises a question of arbitrability which falls under the arbitration agreements and requires an arbitrator to resolve. *See Howsam*, 537 U.S. at 85–86. Accordingly, it is up to the arbitrator to determine the arbitrability of Plaintiff's claims against Charles Schwab, including the application of the FINRA limitation period. Therefore, the Court takes no position on the enforceability or scope of the arbitration clause regarding Plaintiff's claims against Charles Schwab. The arbitrability of these claims should be determined by an arbitrator in accordance with the Parties' arbitration agreements. *See Lower*, 2024 WL 2784326, at *6.

## IV.    Arbitration Avoidance

Plaintiff raises seven challenges to the enforceability of the arbitration agreements he entered into. The Court will first address Plaintiff's argument that the FINRA procedures bar the arbitration of his claims as they arose more than six years ago and FINRA will not permit arbitration of his claims. Next, the Court will address Plaintiff's claim that the arbitration agreements are not enforceable on public policy grounds because they were put in place to further a criminal enterprise. Then, the Court will address Plaintiff's four different, but related, constitutional

challenges to the SEC-FINRA framework. Finally, the Court will address Plaintiff's argument that arbitration clauses included by FINRA members violates the Sherman Antitrust Act. Ultimately, the Court finds that each of these challenges lacks merit and Plaintiff's claims against Merrill Lynch and Deutsche Bank should be arbitrated.[5]

### A.    FINRA Six-Year Limitation Period

One of Plaintiff's many arguments against arbitration is that FINRA Rule 12206(a) bars his claims from arbitration because they arose outside of the six-year time limit to arbitrate those claims (Dkt. #96 at pp. 14–15; Dkt. #100 at pp. 10–11). FINRA Rule 12206(a) states that "[n]o claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim. The panel will resolve any questions regarding the eligibility of a claim under this Rule."[6] According to Plaintiff, the events giving rise to his claims arose more than six years ago, thus they are ineligible for arbitration and he must proceed in court (Dkt. #96 at pp. 14–15; Dkt. #100 at pp. 10–11).

The Court will only look to Deutsche Bank's Reply as Merrill Lynch does not address this argument in its Reply and the Court already found that the application of the time limit to Charles Schwab's claims should be determined by the arbitrator (*See* Dkt. #66).[7] *See supra* Section III.C. Deutsche Bank argues that Plaintiff is wrong for two reasons. First, it states that the applicability of the six-year time limit is one for the arbitrators to decide, not the Court (Dkt. #126 at pp. 12–13).

---

[5] References to Charles Schwab's arguments in this Section are for their persuasive effect only. Charles Schwab responded to the same arguments Plaintiff levied against Merrill Lynch and Deutsche Bank. Ultimately, it is up to the arbitrator to resolve these same issues as they relate to Charles Schwab, in accordance with the arbitration agreement discussed in Section III.C.

[6] The FINRA Rules of arbitration can be found at https://www.finra.org/rules-guidance/rulebooks/finra-rules. For the purpose of convenience, the Court will cite the FINRA Rules as "FINRA Rule ##."

[7] The Court notes that Charles Schwab makes similar arguments as Deutsche Bank in its Reply (*See* Dkt. #109).

To support its contention, Deutsche Bank cites to Supreme Court precedent, which has interpreted the applicability of the time limit rule as one for the arbitrators (Dkt. #126 at p. 12) (citing *Howsam*, 537 U.S. at 85). Second, Deutsche Bank argues that, even if the Court can decide the applicability of FINRA Rule 12206's time limit, the claims are still arbitrable based on FINRA Rule 12206(c) (Dkt. #126 at pp. 12–13). That rule states that the time limit rule "does not extend applicable statutes of limitations; nor shall the six-year time limit on the submission of claims apply to any claim that is directed to arbitration by a court of competent jurisdiction upon request of a member or associated person." FINRA Rule 12206(c). Thus, Deutsche Bank argues that Rule 12206(a) is inapplicable because Rule 12206(c) applies to its Motion (*See* Dkt. #126 at pp. 12–13).

Plaintiff is incorrect that FINRA Rule 12206 bars arbitration of his claims. First, the Supreme Court has held that an arbitration time limit rule like FINRA Rule 12206 is a "matter presumptively for the arbitrator, not for the judge." *Howsam*, 537 U.S. at 85 (stating that the NASD time limit rule "closely resembles the gateway questions this Court has found not to be 'questions of arbitrability'"). Second, federal district courts leave the application of FINRA 12206 to the arbitrators, who will decide whether the six-year time limit bars arbitration for those claims. *See, e.g.*, *Cristo v. Charles Schwab Corp.*, No. 17-CV-1843, 2021 WL 6051825, at *4 (S.D. Cal. Dec. 21, 2021) (upholding an arbitration award where the FINRA arbitral panel used FINRA Rule 12206(c) to find the time limit inapplicable); *Kretsch v. Newman*, No. CV-21-02189, 2022 WL 4079427, at *5–6 (D. Ariz. Sept. 6, 2022) (upholding arbitration award where the FINRA panel tolled Rule 12206(a)); *Huitt v. Willbanks Sec., Inc.*, No. No. 17-cv-00919, 2017 WL 4697502, at *5 (D. Colo. Oct. 19, 2017) ("Because it was for the Panel and not this Court to decide whether Plaintiff's claims fell within Rule 12206(a)'s six-year timeframe, the Court rejects Defendant's invitation to

second-guess the Panel's interpretation of FINRA Rule 12206(a)."); *Mid-Ohio Sec. Corp. v. Est. of Burns*, 790 F. Supp. 2d 1263, 1271–72 (D. Nev. 2011) (finding that Rule 12206 is akin to the statute of limitations for arbitrators to decide, which permits them the freedom to interpret the rule as they see fit, "including adding in tolling provisions or a discovery rule"). Thus, the Court finds that the time limits in FINRA Rule 12206 do not serve as a defense to arbitration, as the FINRA arbitrators should determine its applicability.

### B.    Fraudulent Scheme

Plaintiff also argues that the arbitration agreements are unenforceable because their enforcement would serve to further a criminal scheme (Dkt. #96 at pp. 29–30; Dkt. #100 at pp. 24–25). According to Plaintiff, the arbitration agreements are "instruments of a criminal enterprise and money laundering scheme, rendering Plaintiff's claims nonarbitrable" (Dkt. #36 at pp. 25–28; Dkt. #96 at p. 29; Dkt. #100 at p. 24). To support this argument, Plaintiff cites to Judge Higginbotham's concurrence in *Janvey v. Alguire* (Dkt. #36 at pp. 25–28; Dkt. #96 at pp. 29–30; Dkt. #100 at pp. 24–25) (citing 847 F.3d 231, 246–51 (5th Cir. 2017) (Higginbotham, J., concurring)). *Janvey* discussed the applicability of arbitration agreements to a Ponzi scheme case. *Id.* The majority did not discuss the propriety of arbitration agreements in connection to a criminal enterprise; however, Judge Higginbotham did. *See* 847 F.3d at 244, 246–51. According to Judge Higginbotham, a Ponzi scheme needs privacy to defraud clients. *Id.* at 246–51. So, courts should not enforce arbitration agreements when they are used as an instrument to assist in concealing the existence of the crime. *Id.* According to Plaintiff, the same is true in this case as Defendants are attempting to use arbitration as an instrument to conceal their long-running conspiracy, fraud, and money laundering operation (Dkt. #36 at pp. 26–28; Dkt. #96 at p. 22; Dkt. #100 at p. 25).

The Court disagrees that it should follow Judge Higginbotham's concurrence. First, the Court notes that the Fifth Circuit explicitly stated that it would not answer the question of whether the use of an arbitration agreement in a criminal enterprise should be invalidated. *Id.* at 244 ("We need not reach this issue as we have already determined, on other grounds, that the Receiver cannot be compelled to arbitrate its claims against any of the defendants."). Second, the facts of *Janvey* are different from the facts in the present case. In *Janvey*, the leaders of the Ponzi scheme had already been found guilty of their crimes and were incarcerated. *Id.* at 237. Here, there has been no federal investigation of the claims Plaintiff alleges, nor have any of the Defendants been found guilty of the conduct he alleges. Instead, he asks the Court to apply Judge Higginbotham's reasoning, and to invalidate the arbitration agreements, based solely on his unproven allegations. The Court will not invalidate arbitration agreements in the face of the strong federal preference of enforcing arbitration agreements on mere allegations alone. *See CompuCredit*, 565 U.S. at 98 (discussing the strong federal policy favoring arbitration agreements). Accordingly, the Court finds that public policy does not prohibit the enforcement of the arbitration agreements Plaintiff entered.

## C.    SEC–FINRA Statutory Authority

Plaintiff argues that the SEC lacks the statutory authority to approve FINRA arbitration rules and procedures (Dkt. #36 at pp. 23–25; Dkt. #96 at pp. 31–32; Dkt. #100 at pp. 11–19). To do this, Plaintiff advances two theories. First, he examines the statutorily listed areas in 15 U.S.C. § 78o-3, which delineates the areas where the SEC can approve SRO rules and procedures (Dkt. #36 at pp. 9–10, 23–25; Dkt. #96 at pp. 31–32; Dkt. #100 at pp. 11–19). After examining these provisions, he notes that there is no explicit provision that allows the SEC to approve any alternative dispute resolution procedures, much less arbitration rules and procedures (Dkt. #36 at pp. 23–25; Dkt. #96 at pp. 31–32; Dkt. #100 at pp. 11–19). Without that explicit provision, Plaintiff

argues that the remaining provisions are not broad enough to permit the SEC to approve FINRA arbitration (*See* Dkt. #36 at pp. 23–25; Dkt. #96 at pp. 31–32; Dkt. #100 at pp. 11–19). Second, Plaintiff argues that the Fifth Circuit's decision in *Alliance for Fair Board Recruitment v. Securities and Exchange Commission* dispositively shows that the SEC lacks authority to promulgate arbitration rules (Dkt. #123; Dkt. #137 at pp. 10–13) (citing 125 F.4th 159 (5th Cir. 2024)). Merrill Lynch, Deutsche Bank, and Charles Schwab respond by arguing that the Supreme Court has recognized the SEC's statutory authority to approve SRO arbitral rules and procedures and that *Alliance* is distinguishable from this case (Dkt. #66 at pp. 12–15; Dkt. #109 at pp. 7–9; Dkt. #126 at pp. 13–16; Dkt. #131; Dkt. #132).

The Supreme Court has addressed the statutory authority of the SEC to approve the arbitral procedures and rules of SROs. *See McMahon*, 482 U.S. at 233–34. Since the 1975 amendments to § 19 of the Exchange Act, the SEC "has had expansive power to ensure the adequacy of the arbitration procedures employed by the SROs." *Id.* at 233. "In short, the [SEC] has broad authority to oversee and to regulate the rules adopted by the SROs relating to consumer disputes, including the power to mandate the adoption of any rules it deems necessary to ensure that arbitration procedures adequately protect statutory rights." *Id.* at 233–34. The Court is convinced that the SEC's expansive statutory power to regulate SROs includes the power to regulate arbitration procedures, much as the Supreme Court and Circuit Courts have consistently held. *See id.*; *Pearce v. E.F. Hutton Grp., Inc.*, 828 F.2d 826, 829 (D.C. Cir. 1987); *Roney & Co. v. Goren*, 875 F.2d 1218, 1221 (6th Cir. 1989); *In re Piper Funds, Inc., Institutional Gov't Income Portfolio Litig.*, 71 F.3d 298, 302 (8th Cir. 1995); *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1130 (9th Cir. 2005) ("The Commission's expanded authority includes, for example, 'the power

to mandate the adoption of any rules [the Commission] deems necessary to ensure that arbitration procedures adequately protect statutory rights.'") (quoting *McMahon*, 482 U.S. at 234).

Additionally, the Court finds that *Alliance* does not apply to this dispute. In that case, the Fifth Circuit evaluated whether the SEC could approve a Nasdaq rule that required its members to disclose certain diversity characteristics of its corporate officers and directors. *Alliance*, 125 F.4th at 164. The Fifth Circuit vacated the Nasdaq rule and held that the SEC did not have the statutory authority to approve the diversity disclosure rule. *Id.* at 185. It reasoned that the SEC's statutory authority was limited to approval of those rules which bore some connection to an actual, enumerated purpose of the Exchange Act and the approval of the disclosure rule had no connection to that authority. *Id.* at 175–80. Thus, the SEC lacked authority to approve the rule. *Id.* Plaintiff argues that the same is true here—the SEC does not have explicit statutory authority to approve arbitration rules and thus the arbitration clauses in this case have no force or effect (Dkt. #123; Dkt. #137 at pp. 10–13). Merrill Lynch, Deutsche Bank, and Charles Schwab argue that *Alliance* is distinguishable from the current case as it does not discuss arbitration, nor does it insinuate that the SEC cannot approve arbitration procedures, as has been approved of for decades (Dkt. #126 at pp. 15–16; Dkt. #131; Dkt. #132). The Court agrees that *Alliance* does not apply.

When discussing the Exchange Act, the Fifth Circuit stated that "[t]he Act exists primarily to protect investors and the macroeconomy from speculative, manipulative, and fraudulent practices, and to promote competition in the market for securities transactions." *Id.* at 168. The basis for the SEC's approval of the diversity disclosure rule was that "any disclosure-based exchange rule is related to the purpose of the Exchange Act." *Id.* at 169. Looking to the history and purpose of the Exchange Act, the Fifth Circuit disagreed, finding that the "SEC may not approve

even a disclosure rule unless it can establish the rule has some connection to an actual, enumerated purpose of the Act." *Id.* at 175. Ultimately, it concluded that the diversity disclosure rule did not do so. *Id.* at 175–80.

When examining *Alliance*, an indisputable difference between that case and this one is evident. There, the Fifth Circuit focused on whether the SEC could approve a rule that required the disclosure of racial, gender, and sexual characteristics, something the Fifth Circuit found was not at all related to the purpose of the Exchange Act. *Id.* at 164, 175–80. In contrast, the present case contemplates the SEC's authority to approve arbitration rules, something the Supreme Court has recognized is encompassed within the purpose of the Exchange Act. *McMahon*, 482 U.S. at 233–34. This makes sense. In regulating the arbitration procedures used by SROs, the SEC ensures that the public interest is protected and that members of an SRO do not engage in manipulative or fraudulent arbitration practices. *Id.* at 238 (finding that the SEC has sufficient statutory authority to ensure that arbitration is adequate to vindicate Exchange Act rights). Thus, the Court finds that the SEC has the authority to approve of FINRA arbitration rules and procedures. Accordingly, Plaintiff's challenge to the SEC's statutory authority to approve FINRA's arbitral rules falls flat.

### D.     Private Non-Delegation[8]

In a similar vein as his challenge to the SEC's statutory authority, Plaintiff raises a private non-delegation challenge (Dkt. #36 at pp. 29, 34; Dkt. #96 at p. 27; Dkt. #100 at p. 34; Dkt. #137 at pp. 12–13; Dkt. #144 at ¶¶ 583–86). According to Plaintiff, the SEC violated the private non-delegation doctrine by authorizing FINRA "to set the substantive terms of arbitration, create

---

[8] The Court notes that Plaintiff initially argues he was not making a private non-delegation argument (Dkt. #74 at p. 3). However, he altered his approach by the time of his proposed first amended complaint where he explicitly seeks a declaratory judgment based on the private non-delegation doctrine (Dkt. #144 at ¶¶ 583–86).

rules of arbitration to be applied in private disputes, create a private arbitral forum, or even decide private disputes" (Dkt. #137 at p. 12 n.2). Merrill Lynch, Deutsche Bank, and Charles Schwab argue that courts have repeatedly upheld the SEC-FINRA model in the face of private non-delegation challenges, rendering Plaintiff's challenge meritless (Dkt. #66 at pp. 12–15; Dkt. #109 at pp. 8–9; Dkt. #126 at pp. 13–16).

The Court agrees that the SEC-FINRA framework does not violate the private non-delegation doctrine. First, the Court has already found that the SEC has the statutory authority to approve FINRA arbitration rules and procedures based on binding Supreme Court precedent. *See supra* Section IV.C; *see also McMahon*, 482 U.S. at 233–38. Second, courts have uniformly upheld the SEC-FINRA model against private non-delegation doctrine challenges.[9] *Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 876–77 (5th Cir. 2022) (recognizing that the SEC-FINRA model has been uniformly upheld against private non-delegation challenges); *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012 (3d Cir. 1977); *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952); *cf. Alpine Sec. Corp. v. Fin. Indus. Reg. Auth.*, 121 F.4th 1314, 1331 (D.C. Cir. 2024) (finding in the preliminary injunction context that FINRA's expedited expulsion of a member likely violated the private non-delegation doctrine because there was no practical time for SEC review). This Court will do so as well.

Recently, the Supreme Court discussed the private non-delegation doctrine, and the appropriate test to apply to determine whether a violation of the doctrine has occurred. *See Fed.*

---

[9] A private non-delegation challenge is one that argues a governmental entity has unconstitutionally delegated governmental power to a private entity without sufficient oversight or control by a public agency. *See Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701, 707 (5th Cir. 2017); *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004).

*Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025). There, the Supreme Court held that the test for a proper delegation of authority is to examine whether Congress set out an intelligible principle. *Id.* at 2497. "Under that test, 'the degree of agency discretion that is acceptable varies according to the scope of power congressionally conferred.'" *Id.* (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001)). In determining the intelligible principle, the Court should generally assess whether Congress has made clear the general policy the agency must pursue and the boundaries of its delegated authority. *Id.* Similarly, the test requires the Court to determine if Congress provided sufficient standards to enable the courts and the public to ascertain whether the agency has followed the law. *Id.*

After a careful review of the statue, the Court determines that the Exchange Act clearly permits the SEC to approve rule changes that are "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade . . . and, in general, to protect investors and the public interest . . . ." 15 U.S.C. § 78o-3(b)(6). As the Fifth Circuit has noted, the SEC must approve a proposed rule only if it finds it to be consistent with the requirements of the Exchange Act. *Alliance*, 125 F.4th at 164 (citing 15 U.S.C. § 78s(b)(2)(C)(i)). Thus, the intelligible principle is that the SEC must approve SRO rules when they are consistent with the Exchange Act; i.e., the proposed rule prevents fraud, manipulation, promotes just and equitable trade, or protects investors or the public. *See id.* at 174–75; 15 U.S.C. §§ 78o-3, 78s. This conclusion is consistent with what other courts have found:

> In light of the statutory provisions concerning (a) the Commission's power, according to reasonably fixed statutory standards, to approve or disapprove of the association's Rules, and (b) the Commission's review of any disciplinary action, we see no merit in the contention that the Act unconstitutionally delegates power to the association.

*Sorrell*, 679 F.2d at 1325–26 (quoting *R.H. Johnson*, 198 F.2d at 695); *Todd & Co., Inc.*, 557 F.2d at 1012. Given that the Supreme Court has already discussed SEC approval of SRO arbitration procedures and found that such approval is consistent with the Exchange Act, the Court finds that Plaintiff's private non-delegation doctrine challenge is meritless. *McMahon*, 482 U.S. at 233–38.

### E.    Article III Separation of Powers

Additionally, Plaintiff argues that SEC approval of FINRA arbitration creates a "phalanx of non-Article III tribunals" in violation of Article III, Section 2 of the Constitution (Dkt. #36 at pp. 31–35; Dkt. #96 at pp. 24–28; Dkt. #100 at pp. 19–23) (citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 855 (1986)). To reach this conclusion, Plaintiff provides an unclear, convoluted argument that contradicts itself (*Compare* Dkt. #36 at pp. 31–35; Dkt. #96 at pp. 24–28; Dkt. #100 at pp. 19–23, *with* Dkt. #74 at pp. 3–4; Dkt. #137 at pp. 14; Dkt. #139 at pp. 4–5). In his Responses, he argues that FINRA mandates arbitration clauses in all of its members customer agreements, which inappropriately absorbs all possible claims a consumer could bring and usurps the authority of Article III Courts (Dkt. #36 at pp. 31–35; Dkt. #96 at pp. 24–28; Dkt. #100 at pp. 19–23). However, in his Sur-Replies he concedes that the specific arbitration clause is only included when a FINRA member elects to include an arbitration agreement in the contract (Dkt. #74 at pp. 3–4; Dkt. #137 at pp. 14; Dkt. #139 at pp. 4–5). Thus, to Plaintiff, by voluntarily including an arbitration agreement and complying with FINRA arbitral procedures, the SEC and FINRA created a hideous monster capable of devouring the fragile constitutional framework and usurping this Court's authority (*See* Dkt. #36 at pp. 31–35; Dkt. #74 at pp. 3–4; Dkt. #96 at pp. 24–28; Dkt. #100 at pp. 19–23; Dkt. #137 at pp. 14; Dkt. #139 at pp. 4–5). Merrill Lynch, Deutsche Bank, and Charles Schwab respond that they voluntarily included arbitration clauses in their contracts—clauses Plaintiff agreed to be bound by (Dkt. #66 at pp. 15–17; Dkt. #109 at p. 8;

Dkt. #126 at p. 17). Additionally, they argue that the cases Plaintiff cites do not support the proposition that arbitration by a private party in a private forum implicates a separation of powers concern (Dkt. #66 at pp. 15–17; Dkt. #109 at p. 8; Dkt. #126 at p. 17).

What appears as a monster to Plaintiff is, in fact, the everyday application of contract law and the federal presumption in favor of arbitration. The Court has already found that Plaintiff entered into valid and enforceable arbitration agreements. *See supra* Section III. Plaintiff misinterprets the Supreme Court's focus in *Schor*. There, the Supreme Court was concerned with *Congress* creating an impenetrable wall whereby parties were forced into a non-judicial forum to handle disputes. *Id.* ("if *Congress* created a phalanx of non-Article III tribunals . . .") (emphasis added). The Supreme Court clearly saw this as separate and distinct from the private agreement between parties to arbitrate, which is the case here. *Id.* ("[I]t seems self-evident that just as Congress may encourage parties to settle a dispute out of court or *resort to arbitration* without impermissible incursions on the separation of powers, Congress may make available a quasi-judicial mechanism through which willing parties may, at their option, elect to resolve their differences.") (emphasis added). Thus, *Schor* does not provide the basis for a separation of powers argument that would gut the FINRA arbitral structure, which was approved by the SEC based on Congress's statutory scheme and sanctioned by the Supreme Court. *See McMahon* 482 U.S. at 233–34 (1987); *United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 733 (1975).

Additionally, the Court notes that Plaintiff has not cited *any* case stating that the arbitration structure approved of by the Supreme Court *for decades* violates the separation of powers. *See McMahon* 482 U.S. at 233–34 (1987); *Nat'l Ass'n of Sec. Dealers*, 422 U.S. at 733. The Court has authority to hear Plaintiff's claims, but so does the arbitral forum *he contractually agreed* to go

44

before. The Court will uphold the agreements Plaintiff entered into, even if he now wishes to avoid those very obligations. Accordingly, the Court finds that the separation of powers is not implicated by the FINRA arbitration agreements in this case.

### F.    Seventh Amendment Right to a Jury Trial

Plaintiff uses the Supreme Court's decision in *Securities and Exchange Commission v. Jarkesy* to argue that he has a Seventh Amendment right to a jury trial, which cannot be waived by the SEC's approval of FINRA arbitration (Dkt. #36 at pp. 35–36; Dkt. #74 at pp. 4; Dkt. #96 at pp. 28–29; Dkt. #100 at pp. 23–24; Dkt. #137 at pp. 15–16; Dkt. #139 at p. 5) (citing 603 U.S. 109 (2024)). Merrill Lynch, Deutsche Bank, and Charles Schwab respond by arguing that *Jarkesy* is distinguishable because of its narrow holding (Dkt. #66 at pp. 17–19; Dkt. #109 at pp. 7–8; Dkt. #126 at pp. 17–18). Additionally, they argue that a jury trial is waivable when a party voluntarily and knowingly enters into an arbitration agreement with a private party (Dkt. #66 at pp. 17–19; Dkt. #109 at pp. 7–8; Dkt. #126 at pp. 17–18). The Court agrees that the Seventh Amendment is not implicated in this case.

First, the Supreme Court was expressly clear about the limited issue it sought to resolve in *Jarkesy*: "The case poses a straightforward question: whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against him for securities fraud." *Jarkesy*, 603 U.S. at 120. The Supreme Court sought to determine whether the SEC could assess civil penalties through an in-house adjudication before one of its administrative law judges. *Id.* at 115. This fact is important, as the SEC sought to *punish* the defendant for his actions, not to seek compensatory damages. *Id.* at 123 ("[C]ivil penalties are a type of remedy at common law that could only be enforced in courts of law."). The Court held that when the SEC seeks to punish someone for fraud a jury trial is required. *Id.* at 140. Here, Plaintiff, not the SEC or Defendants,

seeks compensatory damages for the alleged misconduct of Defendants (*See* Dkt. #1). Thus, this case has a very different posture than *Jarkesy*. Therefore, the Court finds that *Jarkesy's* holding is limited to situations where an executive agency seeks to enforce penalties for fraud without a jury trial, not a case where a plaintiff bound by an arbitration agreement seeks compensatory damages.

Second, the right to a jury trial in civil cases is waivable. *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982); *Schor*, 478 U.S. 833, 848–49 (recognizing that private litigants may waive the right to a jury trial); *Am. Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 712 (5th Cir. 2000) ("The Seventh Amendment right to a trial by jury is limited by a valid arbitration provision that waives the right to resolve a dispute through litigation in a judicial forum."); FED R. CIV. P. 38(d) ("A party waives a jury trial unless its demand is properly served and filed. A proper demand may be withdrawn only if the parties consent."). Here, the Court has already found that Plaintiff voluntarily and knowingly entered into enforceable arbitration agreements. *See supra* Section III. Accordingly, the Court finds that Plaintiff voluntarily and knowingly waived his right to a jury trial in favor of arbitration and there are no Seventh Amendment concerns raised by enforcing those agreements. *Am. Heritage*, 294 F.3d at 712.

### G.    Sherman Act Violations

Plaintiff also argues that the Defendants violated the Sherman Antitrust Act by following FINRA regulations and including the agreed-on clauses in their agreements (Dkt. #36 at p. 37; Dkt. #96 at pp. 31–32; Dkt. #100 at pp. 26–27). According to Plaintiff, FINRA is a conduit that permits unlawful horizontal agreements between its members, such that they can all force consumers into arbitration agreements and thereby restrict free trade. (*See* Dkt. #36 at p. 37; Dkt. #96 at pp. 31–32; Dkt. #100 at pp. 26–27). Plaintiff is wrong. The Supreme Court has already addressed the propriety of the regulatory framework that Congress set up for the SEC and SROs.

46

*See generally Nat'l Ass'n of Sec. Dealers*, 422 U.S. 694.[10] When examining the relationship between the SEC and SROs the Supreme Court stated:

> [T]he investiture of such pervasive authority in the SEC suggests that Congress intended to lift the ban of the Sherman Act from association activities approved by the SEC. We further conclude that the Government's attack on NASD interpretations of those rules cannot be maintained under the Sherman Act for we see no meaningful distinction between the Association's rules and the manner in which it construes and implements them. Each is equally a subject of SEC oversight.

*Id.* at 733.

The Court finds that binding Supreme Court precedent disposes of Plaintiff's argument. The regulatory framework Congress enacted provides an exception to the Sherman Act for SRO regulations approved by the SEC. *See id.* Thus, Plaintiff's challenge falls flat. Accordingly, as the arbitration agreements are enforceable, the Court finds that Plaintiff should be compelled to arbitrate his disputes against Merrill Lynch and Deutsche Bank consistent with those agreements.

## V.    Morgan Stanley's Motion

Morgan Stanley filed a Motion to Compel Arbitration, and, in the alternative, Motion to Sever and Transfer, and, in the alternative, Motion to Dismiss (Dkt. #48). Through it, Morgan Stanley presents two contracts that purportedly require Plaintiff to elect either to arbitrate this dispute or to litigate in the Southern District of New York (Dkt. #48 at pp. 24–30). Morgan Stanley admits that it cannot actually compel Plaintiff to arbitrate, as its agreements allow him the option to elect arbitration or litigation (Dkt. #48 at pp. 19–22). Thus, Morgan Stanley asks the Court to either deem that Plaintiff has elected litigation, which would require the Court to evaluate whether a severance and transfer is warranted, or to require Plaintiff to provide Morgan Stanley with his

---

[10] The Court notes that Plaintiff wholly omits any discussion of this precedential case, nor why it is inapplicable to his claims.

election choosing arbitration or litigation (Dkt. #48 at pp. 19–30). Should the Court deny Morgan Stanley's Motion to Compel Arbitration and to Sever and Transfer, Morgan Stanley asks the Court to dismiss the action under Rule 12(b)(6) (Dkt. #48 at pp. 30–54).

Plaintiff's Response begins by taking aim at Morgan Stanley Smith Barney and arguing that it was not a party to the agreements Morgan Stanley relies on (Dkt. #94 at p. 20–21). Thus, according to Plaintiff, Morgan Stanley Smith Barney cannot use the forum selection clause or any other contractual agreement that it was not a party to, since Morgan Stanley did not acquire Smith Barney until 2012 (Dkt. #96 at pp. 20–21). Plaintiff then turns to his primary argument—that the 1994 and 1997 Agreements Morgan Stanley relies on were superseded by 1999 RepoSweep Agreements (Dkt. #96 at pp. 21–24). According to Plaintiff, the 1999 Agreements do not require Plaintiff to make any election and do not contain a mandatory forum selection clause (Dkt. #96 at pp. 21–30). Additionally, Plaintiff argues that, even if the 1994 and 1997 Agreements control, the forum selection clauses are directly at odds with the civil RICO venue provision and should thus be severed from the contracts (Dkt. #48 at pp. 29–30). Thus, Plaintiff argues that he is free to proceed in this Court and the Court should perform a normal convenience transfer analysis, which requires the case to stay in this Court (Dkt. #96 at pp. 21–30).

Morgan Stanley begins its Reply by arguing that Smith Barney is included in the 1994 and 1997 Agreements because it is a subsidiary of Morgan Stanley (Dkt. #125 at pp. 7–8). Further, Morgan Stanley argues that Plaintiff's Response shows that Plaintiff has not stated a claim for relief against Smith Barney as the Complaint does not allege any direct actions by Smith Barney, much less any actions against it as an individual entity before its acquisition (Dkt. #125 at pp. 7–8). Next, it argues that the 1994 and 1997 Agreements were not superseded by the 1999 RepoSweep

Agreements because the earlier agreements were broader and related to Plaintiff's entire account, whereas the 1999 Agreements govern a narrow set of transactions involving "specific money market investments" (Dkt. #125 at pp. 8–11). Further, it argues that the civil RICO venue provision is permissive and does not affect its Motion to Transfer based on the mandatory forum selection clauses (Dkt. #125 at pp. 12–13). Thus, as the earlier agreements govern the dispute in this case, Morgan Stanley argues that the mandatory forum selection clauses apply and its Motion for severance and transfer should be granted (Dkt. #125 at pp. 11–14).

Plaintiff begins his Sur-Reply by arguing that Morgan Stanley has waived its ability to compel arbitration by engaging in litigation and discovery while its Motion to Compel Arbitration was pending (Dkt. #138 at pp. 4–7). Next, Plaintiff reiterates his arguments that the earlier in time agreements were superseded, such that the mandatory forum selection clauses are inapplicable (Dkt. #128 at pp. 7–8). Then he returns to his arguments that the civil RICO venue provision is mandatory and that Smith Barney cannot be included in any severance or transfer because Morgan Stanley has not proffered any agreement between Plaintiff and Smith Barney with a forum selection clause (Dkt. #138 at pp. 8–10).

In Response to Plaintiff's new argument regarding waiver, Morgan Stanley filed a Motion to Strike that portion of Plaintiff's Sur-Reply, or in the alternative, to file a Sur-Sur-Reply to address the new arguments (Dkt. #141; Dkt. #142). Through Morgan Stanley's Motion to Strike, it argues that Plaintiff raised the new waiver arguments for the first time in his Sur-Reply, in violation of Local Rule CV-7(f) and Fifth Circuit precedent (Dkt. #141 at pp. 1–3). Plaintiff Responds by arguing that he had no choice but to present the waiver arguments in his Sur-Reply as Morgan Stanley did not perform the waiver until after he filed his Response (Dkt. #151). Morgan

Stanley counters that the timing does not excuse Plaintiff's failure to comply with the Court's Local Rules, and thus those portions of his Sur-Reply should be stricken (Dkt. #156).

As a preliminary matter, the Court will rule on Morgan Stanley's Motion to Strike (Dkt. #141). The Court agrees with Morgan Stanley. Local Rule CV-7(f) states that "[a] sur-reply *responding to issues raised in the reply* may be served and filed within seven days from the date the reply is served." LOCAL RULE CV-7(f) (emphasis added). As the waiver argument was not addressed or mentioned at any point prior to Plaintiff's Sur-Reply, and Plaintiff did not seek leave to make that argument, the Court will not consider it. LOCAL RULE CV-7(f).[11] Accordingly, the Court finds that it should strike Section I of Plaintiff's Sur-Reply (Dkt. #138 at pp. 4–7) and deny Morgan Stanley's Motion for Leave to file a Sur-Sur-Reply as moot (Dkt. #142).

The Court will now proceed to evaluate the merits of Morgan Stanley's Motion. First, the Court will determine which agreements are controlling and what obligations Plaintiff and Morgan Stanley agreed to. Next, the Court will determine whether the claims against Morgan Stanley should be severed and transferred. They should.

### A.    Controlling Agreement

The first step in this evaluation is to determine the controlling contracts between Plaintiff and Morgan Stanley. In 1994 Plaintiff entered into a "Customer's Agreement (Margin Account)" with Morgan Stanley (Dkt. #48-3). The Customer Agreement provides the governing rules and obligations between Plaintiff and Morgan Stanley for any interaction between them (*See* Dkt. #48-3 at p. 2). Further, the Customer Agreement states that Morgan Stanley includes:

---

[11] Even if the Court were to consider Plaintiff's waiver argument, that argument is inapplicable to the instant dispute. Morgan Stanley cannot compel arbitration based on the terms of its Agreements.

> Morgan Stanley & Co. Incorporated, its subsidiaries and parents and all affiliates and divisions including but not limited to Morgan Stanley International, Morgan Stanley Japan Ltd., Morgan Stanley Asia Ltd., Morgan Stanley Trust Company, Morgan Stanley GMBH, Morgan Stanley Bank Luxembourg, Morgan Stanley Market Products Inc., Morgan Stanley Capital Group Inc., Morgan Stanley Group Incorporated, and their officers, directors, agents and/or other employees.

(Dkt. #48-3 at p. 2). As to disputes, the Customer Agreement requires Plaintiff to make an election to arbitrate the dispute, or to litigate the dispute, where there is "any dispute . . . arising out of, relating to or in connection with [Plaintiff's] business, any transaction or contract between us or this agreement" (Dkt. #48-3 at p. 3). If litigation is elected, it "must be instituted in the United States District Court for the Southern District of New York" (Dkt. #48-3 at p. 4). Additionally, the Customer Agreement has a "Modification and Waiver" clause, that states "[Plaintiff] agrees that [Morgan Stanley] may modify the terms of this agreement at any time upon prior written notice." (Dkt. #48-3 at p. 4).

In 1997, Plaintiff entered into a "Sweep Service Agreement" with Morgan Stanley (Dkt. #48-4). The Sweep Service Agreement supplements the Customer Agreement: "This Agreement is in addition to and supplements the customer agreement which [Plaintiff] has previously executed and which remains in full force and effect" (Dkt. #48-4 at p. 2). The service provided under the Sweep Service Agreement consists of the following: "(1) a Morgan Stanley securities account . . . which is either a cash account or margin account, and (2) a choice of registered investment companies . . . into which [Morgan Stanley] will automatically invest free credit balances in [Plaintiff's] Securities Account" (Dkt. #48-4 at p. 2). The Sweep Service Agreement provides the same dispute resolution terms found in the 1994 Customer Agreement (*Compare* Dkt. #48-3 at pp. 3–4, *with* Dkt. #48-4 at pp. 4–5).

However, in 1999, Plaintiff entered into two RepoSweep Agreements (Dkt. #94-3; Dkt. #94-4). The 1999 Agreements govern a specific set of transactions, whereby Plaintiff would transfer cash to Morgan Stanley (Dkt. #94-3 at p. 3; Dkt. #94-4 at p. 3). In exchange, Morgan Stanley would transfer U.S. Treasury Securities or Government National Mortgage Association Securities to Plaintiff in an amount slightly above the cash transferred by Plaintiff to Morgan Stanley (Dkt. #94-3 at p. 3; Dkt. #94-4 at p. 3). On the following business day, Plaintiff and Morgan Stanley would retransfer the assets and Morgan Stanley would compensate Plaintiff with an agreed upon interest rate (Dkt. #94-3 at p. 3; Dkt. #94-4 at p. 3). The RepoSweep Agreements contain a merger clause that states:

> With respect to [Plaintiff] and Morgan Stanley, each Transaction shall be subject to (i) this RepoSweep Agreement, and (ii) the terms of the Public Securities Association Master Repurchase Agreement August 1987 Version (the "PSA Agreement"), to the extent that the PSA Agreement is not inconsistent with this RepoSweep Agreement. This RepoSweep Agreement and the PSA Agreement . . . represent the entire agreement between [Plaintiff] and Morgan Stanley.

(Dkt. #94-3 at p. 4; Dkt. #94-4 at p. 4). Following the merger clause, the RepoSweep Agreement provides a permissive forum selection clause: "The parties hereby consent to the jurisdiction of a state or federal court situated in New York City, New York in connection with any dispute hereunder." (Dkt. #94-3 at p. 4; Dkt. #94-4 at p. 4).

Morgan Stanley argues that the 1994 Customer Agreement, supplemented by the 1997 Sweep Service Agreement, controls the instant dispute (Dkt. #48 at pp. 19–30; Dkt. #125 at pp. 7–14). Thus, it urges the Court to deem that Plaintiff has elected litigation under the 1994 and 1997 Agreements and to enforce the mandatory forum section clauses they contain (Dkt. #48 at pp. 19–30; Dkt. #125 at pp. 7–14). Plaintiff disagrees and argues that the 1999 RepoSweep Agreements superseded the 1994 and 1997 Agreements based on the merger clause stating that the

1999 Agreement is the "entire agreement between [Plaintiff] and Morgan Stanley" (Dkt. #94 at pp. 20–30; Dkt. #138 at pp. 7–10). Ultimately, the Court agrees with Morgan Stanley.

The 1994, 1997, and 1999 Agreements all contain New York choice of law clauses and Plaintiff does not challenge the application of New York law (Dkt. #48-3 at p. 4; Dkt. #48-4 at p. 5; Dkt. #94-3 at p. 4; Dkt. #94-4 at p. 4; *see also* Dkt. #94; Dkt. #138). Thus, the Court will apply New York law to determine which agreement controls. *Edwards*, 2016 WL 7852532, at *5–6 (citing *Overstreet*, 462 F.3d at 411). Under New York law, a later in time agreement does not supersede an earlier agreement when the subsequent agreement does not deal with same subject matter as the precedent agreement. *Blumenfeld Dev. Grp., Ltd. v. Forest City Ratner Cos., LLC*, 36 N.Y.S.3d 46, 2016 WL 700639, at *7 (N.Y. Sup. Ct. 2016); *Ott. Off. Integration Inc. v. FTF Bus. Sys., Inc.*, 132 F. Supp. 2d 215, 219 (S.D.N.Y. 2001). Further, a subsequent agreement will not supersede a prior agreement when both agreements can be read harmoniously. *See supra* Section III.B; *Hauser v. W. Grp. Nurseries, Inc.*, 767 F. Supp. 475, 488 (S.D.N.Y. 1991) (applying New York law); *Kobylarz v. Nett*, 192 A.D.2d 980, 982 (N.Y. App. Div. 1993). Here, the Agreements work harmoniously to set out what disputes are covered by which Agreements. First, the 1994 Customer Service Agreement, supplemented by the 1997 Sweep Service Agreement, governs the general contours of all interactions between Plaintiff and Morgan Stanley (Dkt. #48-3; Dkt. #48-4). Further, the 1994 Agreement specifically lists "repurchase agreements" as one of the interactions it governs (Dkt. #48-3 at p. 1). Pursuant to the modification clause in the 1994 Customer Service Agreement, the 1999 RepoSweep Agreements supersede the 1994 Agreement on repurchase agreements (*See* Dkt. #48-3 at p. 4; Dkt. #94-3; Dkt. #94-4). Thus, the RepoSweep Agreements do not supersede any other aspect of the 1994 Agreement (*See* Dkt. #48-3 at p. 4; Dkt. #94-3; Dkt. #94-4).

Second, by its own terms, the RepoSweep Agreements only deal with the specific transactions listed (*See* Dkt. #94-3 at p. 3; Dkt. #94-4 at p. 3). Thus, the RepoSweep Agreements only provide the permissive forum selection clause for disputes arising out of the narrow set of transactions involving the listed U.S. Treasury Securities or Government National Mortgage Association Securities when transferred and retransferred according to the terms of those Agreements (Dkt. #94-3 at pp. 3–5; Dkt. #94-4 at pp. 3–5). However, if a dispute arises that is not related to those specific transactions, the 1994 and 1997 Agreements control, which require an election of arbitration or litigation in the Southern District of New York (*See* Dkt. #48-3; Dkt. #48-4). Here, Plaintiff's Complaint alleges conduct that goes beyond the terms of the RepoSweep Agreements as the alleged conduct involves securities that are not exclusively U.S. Treasury Securities or Government National Mortgage Association Securities (Dkt. #1 at ¶¶ 125–303). Therefore, the Court finds that the 1994 Customer Service Agreement and 1997 Sweep Service Agreement are the controlling agreements for this dispute.

In so far as it is necessary, the Court deems that Plaintiff has elected litigation and has forgone his opportunity to elect arbitration. *See, e.g.*, *Forby v. One Techs., L.P.*, 909 F.3d 780, 783 (5th Cir. 2018); *Kenyon Intern. Emergency Servs., Inc. v. Malcolm*, No. H-09-3550, 2010 WL 2303328, at *4–5 (S.D. Tex. June 7, 2010) (finding that a plaintiff waived arbitration by pursing litigation, compelling arbitration would harm other parties, and that the plaintiff had acted inconsistently with the privilege to arbitrate by seeking litigation first). While the Court finds it odd that Plaintiff has refused to affirmatively elect litigation, given the fact he has filed a lawsuit in this Court and has fought arbitration every step of the way, the Court finds his actions have constituted

an election of litigation. The various motions fighting arbitration, and Plaintiff's Motion for Leave to file an Amended Complaint, supports the Court's conclusion that Plaintiff has elected litigation.

### B.    Transfer

The Court will now proceed to determine if it should sever and transfer the claims against Morgan Stanley to the Southern District of New York, based on the mandatory forum selection clause found in the 1994 and 1997 Agreements. All three Morgan Stanley entities moved to sever and transfer based on the forum selection clause (Dkt. #48). However, Plaintiff argues that Morgan Stanley Smith Barney was not a party to those agreements and cannot seek a transfer on those grounds (Dkt. #94). Thus, the Court will first consider whether Smith Barney can join the other Morgan Stanley entities in seeking to enforce the forum selection clause. It can. Next, the Court will proceed to the merits of Morgan Stanley's Motion to Sever and Transfer.

### 1.    Morgan Stanley Smith Barney

Plaintiff challenges Smith Barney's ability to use the forum selection clause as it was not acquired by Morgan Stanley until 2012, years after Plaintiff and Morgan Stanley entered into the Agreements (Dkt. #94 at pp. 20–21). Morgan Stanley argues that there are no temporal restrictions in the 1994 and 1997 Agreements that would prohibit Smith Barney from using the forum selection clause, especially when Plaintiff has levied no allegations against Smith Barney individually (Dkt. #125 at pp. 7–8). Plaintiff responds that he has an agreement with Smith Barney but that Morgan Stanley did not move to transfer on that agreement, so Smith Barney cannot use the forum selection clause (Dkt. #138 at p. 10).[12]

---

[12] Plaintiff does not attach the agreement he purports to have with Smith Barney, nor does his Response set out any individual conduct Smith Barney performed that would set it apart from the other Morgan Stanley entities (*See* Dkt. #1; Dkt. #94; Dkt. #138).

As a general rule, only parties in privity of contract may enforce a forum selection clause found within a contract. *Bernstein v. Wysoki*, 77 A.D.3d 241, 251 (N.Y. App. Div. 2010). However, New York courts permit a non-signatory to an agreement to invoke a forum selection clause in three circumstances:

> First, it is well settled that an entity or individual that is a third-party beneficiary of the agreement may enforce a forum selection clause found within the agreement. Second, parties to a 'global transaction' who are not signatories to a specific agreement within that transaction may nonetheless benefit from a forum selection clause contained in such agreement if the agreements are executed at the same time, by the same parties or for the same purpose. Third, a nonparty that is 'closely related' to one of the signatories can enforce a forum selection clause. The relationship between the nonparty and the signatory in such cases must be sufficiently close so that enforcement of the clause is foreseeable by virtue of the relationship between them.

*Id.* (quoting *Freeford Ltd. v. Pendleton*, 53 A.D.3d 32, 38–39 (N.Y. App. Div. 2008)).

When a subsidiary is acquired after a contract is entered, the Court will apply the third test—whether the non-signatory is closely related to a signatory such that the enforcement of the clause is foreseeable because of the relationship between them. *See, e.g.*, *Oberon Sec., LLC v. Titanic Ent. Holdings LLC*, 198 A.D.3d 602, 603 (N.Y. App. Div. 2021); *Indosuez Intern. Fin., B.V. v. Nat. Rsrv. Bank*, 304 A.D.2d 429, 431 (N.Y. App. Div. 2003).

The Court finds that Smith Barney has a sufficiently close relationship with the other Morgan Stanley entities that enforcement of the forum selection clause against Plaintiff is foreseeable. First, and most obvious, Plaintiff did not sue Smith Barney alone. Instead, he also sued two other Morgan Stanley entities. Thus, it is clear that Smith Barney would take the same actions as the other Morgan Stanley entities—as clearly evidenced by the fact that Morgan Stanley's counsel of record represents all three entities and that Plaintiff refers to all Morgan Stanley entities as a collective group throughout the Complaint (*See* Dkt. #1). Second, all parties agree that Morgan

Stanley Smith Barney is a subsidiary of Morgan Stanley (Dkt. #1 at ¶ 10; Dkt. #94 at pp. 20–21; Dkt. #125 at pp. 7–8). The 1994 Customer Agreement states that it applies to all Morgan Stanley subsidiaries and affiliates (Dkt. #48-3 at p. 2). Thus, based on the language of the 1994 Agreement, it is also foreseeable Smith Barney would join in the Motion to enforce the forum selection clause.

Third, Plaintiff's own Complaint and allegations throughout this lawsuit further support this finding. The Complaint makes no meaningful distinction between the three Morgan Stanley entities (*See* Dkt. #1). In fact, the Complaint states that "Morgan Stanley, [Morgan Stanley] & Co., and [Morgan Stanley Smith Barney] are referred to collectively as 'Morgan Stanley'" (Dkt. #1 at ¶ 9). Further, after searching the Complaint, the Court has only found mention of the term "Smith Barney" twice: (1) when describing the parties to the action, and (2) in a quote regarding a Morgan Stanley Smith Barney investment advisor who operated a Ponzi scheme in an unrelated case (Dkt. #1 at ¶¶ 9, 46). Thus, as Plaintiff does not distinguish any conduct that Smith Barney undertook itself, the Court finds that it is clear that Plaintiff could foresee that Smith Barney would seek to enforce the forum selection clause. Accordingly, the Court will include Smith Barney with the other Morgan Stanley entities as it applies the severance and transfer analysis.

### 2.    Forum Selection Clause

When considering whether to transfer a case under § 1404(a) when there is a forum selection clause, courts in the Fifth Circuit apply a three-step process. *PCL Civ. Constructors, Inc. v. Arch Ins. Co.*, 979 F.3d 1070, 1074 (5th Cir. 2020). The first step is to determine whether the forum selection clause is valid, mandatory, and whether the dispute falls within the scope of the clause. *Id.* at 1073. This interpretation is governed by state law, which is determined based on the original forum state's choice of law rules. *Weber*, 811 F.3d at 770. If the Court determines that the forum selection clause is valid, mandatory, and the dispute falls within the scope of the clause, the

second step is to determine whether the clause is enforceable. *Id.* at 773–74. "The enforceability of a forum selection clause is a matter of federal law, and there is a 'strong presumption in favor of the enforcement of mandatory forum selection clauses.'" *Davis v. Meta Platforms, Inc.*, No. 4:22-CV-01001, 2023 WL 4670491, at *9 (E.D. Tex. July 20, 2023) (quoting *PCL*, 979 F.3d at 1074). Finally, if the Court finds that the forum selection clause is enforceable, it must determine whether extraordinary circumstances weigh against transfer. *Atl. Marine*, 571 U.S. at 62. To make this determination, the Court will evaluate the public interest factors set out by the Supreme Court in *Atlantic Marine*. *Id.* at 64. The party opposing transfer must "bear the burden of showing that public interest factors overwhelmingly disfavor a transfer." *Id.* at 67. "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 65.

Although enforceability of a forum selection clause is analyzed under federal law, where both a valid forum selection clause and a choice of law clause exist, the substantive law identified in the choice of law clause governs interpretation of the forum selection clause. *See Atl. Marine*, 571 U.S. at 62 (observing that lower court "erred in failing to make the adjustments required" because "the transfer motion [was] premised on a forum-selection clause"); *Martinez v. Bloomberg LP*, 740 F.3d 211, 220 (2d Cir. 2014) ("[C]ourts must apply the law contractually chosen by the parties to interpret the [forum selection] clause."). When a case arises under a court's federal question jurisdiction, the Court must apply federal common law choice-of-law principles to determine the law of the state that will apply. *Haynsworth*, 121 F.3d at 962 (5th Cir. 1997). Under federal common law, the Court must give effect to a choice-of-law provision unless a party shows

that the clause is "unreasonable under the circumstances." *Edwards*, 2016 WL 7852532, at *5–6 (citing *Ginter*, 536 F.3d at 449; *Mitsui*, 111 F.3d at 35).

The 1994 Customer Agreement between Morgan Stanley contains a choice of law clause. It states that the "Agreement, its enforcement, any contract and any dispute between us, whether arising out of or relating to [Plaintiff's] accounts or otherwise, shall be governed by the law of the state of New York, excluding its conflict of law rules." (Dkt. #48-3 at p. 4). Likewise, the 1997 Sweep Service Agreement states "[t]his Agreement, its enforcement, any contract and any dispute between the parties . . . shall be governed by the law of the state of New York . . . ." (Dkt. #48-4 at p. 5).[13] Plaintiff does not challenge that the choice of law clause is unreasonable under the circumstances, so the Court will apply New York substantive law to interpret the forum selection clause. *Edwards*, 2016 WL 7852532, at *5–6 (citing *Overstreet*, 462 F.3d at 411).

The Court must first determine whether the forum selection clause is mandatory or permissive in nature. *PCL*, 979 F.3d at 1073. There is a sharp distinction between a mandatory and permissive forum selection clause, as only a mandatory forum selection clause justifies transfer. *Weber*, 811 F.3d at 769. A mandatory forum selection clause "affirmatively requires that litigation arising from the contract be carried out in a given forum." *Id.* Here, the forum selection clause states that "when any dispute arises, any litigation must be instituted in the United States District Court for the Southern District of New York" (Dkt. #48–3 at p. 4; Dkt. #48-4 at p. 5). The term "must" is unambiguously clear that the forum selection clause is mandatory and should be enforced. *Walker, Truesdell, Roth & Assocs., Inc. v. Globeop Fin. Servs. LLC*, 993 N.Y.S.2d 647, 2013

---

[13] Additionally, the 1999 RepoSweep Agreements also contain New York choice of law clauses (Dkt. #94-3 at p. 4; Dkt. #94-4 at p. 4) ("This Agreement, Clients Account and the rights and interests of any party with respect to Client's Account shall be governed by and construed in accordance with the internal laws of the State of New York . . . .").

WL 85947474, at *5 (N.Y. Sup. Ct. 2013) (citing *Micro Balanced Prods. Corp. v. Hlavin Indus. Ltd.*, 238 A.D.2d 284, 284–85 (N.Y. App. Div. 1997); *Erie Ins. Co. of N.Y. v. AE Design, Inc.*, 104 A.D.3d 1319, 1320 (N.Y. App. Div. 2013)) ("The Courts have repeatedly found forum selection clauses mandatory if they provide that a specified forum 'shall' hear a matter or that the forum is 'exclusive'"); *Silvestre v. De Loaiza*, 820 N.Y.S.2d 440, 444 (N.Y. Sup. Ct. 2006) (finding the words "will be decided" as indicative of a mandatory forum selection clause).

It is well settled under New York law that a forum selection clause is prima facie valid. *Hirschman v. Nat. Textbook Co.*, 184 A.D. 494, 495 (N.Y. App. Div. 1992). To set aside a forum selection clause, the party challenging the clause must show:

> [E]ither that enforcement would be unreasonable and unjust or that the clause is invalid because of fraud or overreaching, such that a trial in the forum set in the contract would be so gravely difficult and inconvenient that the challenging party would, for all practical purposes, be deprived of his or her day in court.

*Id.* Absent a showing that a forum selection clause should be set aside, the Court will enforce the forum selection clause as valid. *See id.* Here, Plaintiff does not make any argument that the 1994 and 1997 Agreements were a product of overreaching, were unreasonable, or that their enforcement would be unjust. *See id.* Thus, the Court finds that the forum selection clause is valid.

New York courts favor a broad reading of forum selection clauses and they interpret the term 'any' as "all-encompassing language, indicating the parties' belief that all actions regarding their relationship will be governed by the forum selection clause." *Triple Z Postal Servs., Inc. v. United Parcel Serv., Inc.*, 831 N.Y.S.2d 357, 2006 WL 3393259, at *7 (N.Y. Sup. Ct. 2006) (citing *Travelers Prop. Cas. Co. of Am. v. Centimark, Corp.*, No. 2:04-CV-0916, 2005 WL 1038842, at *2 (S.D. Ohio May 3, 2005)); *Couvertier v. Concourse Rehab. & Nursing, Inc.*, 117 A.D.3d 772, 773 (N.Y. App. Div. 2014). Here, the forum selection clause states that "any dispute" must be litigated in

the Southern District of New York (Dkt. #48-3 at p. 4; Dkt. #48-4 at p. 5). All of Plaintiff's claims against Morgan Stanley relate to his accounts while he was a customer at Morgan Stanley (*See* Dkt. #1). Thus, Plaintiff's claims fall within the scope of the forum selection clause.

The Court next turns to the issue of enforceability, which is a matter governed by federal law. *Weber*, 811 F.3d at 769. "A valid, mandatory, and applicable forum selection clause is presumptively enforceable." *Davis*, 2023 WL 4670491, at *11 (citing *Weber*, 811 F.3d at 769). Thus, the Court's conclusion that the forum selection clause is mandatory, valid, and applicable requires Plaintiff to carry a "heavy burden" of showing that enforcement of the forum selection clause would be unreasonable here. *Weber*, 811 F.3d at 773–74. The enforcement of a forum selection clause may be unreasonable when:

> (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of [her] day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

*PCL*, 979 F.3d at 1074 (quoting *Haynsworth v. The Corporation*, 121 F.3d 956, 963 (5th Cir. 1997)).

Plaintiff's argument does not explicitly address any of the unreasonableness factors (*See* Dkt. #94; Dkt. #138). Instead, he attempts to resist the mandatory nature of the forum selection clause by arguing that it contradicts the civil RICO venue provision and is thereby rendered permissive due to the severability provision in the 1994 Agreement (Dkt. #94 at pp. 28–29). The 1994 Agreement states:

> If any provision of this agreement is or becomes inconsistent with any applicable present or future law, rule or regulation, that provision will be deemed modified or, if necessary rescinded in order to comply with the relevant law, rule, or regulations. All other provisions will remain in full force and effect.

(Dkt. #94 at p. 29) (citing Dkt. #48-3 at p. 4).

The civil RICO statute provides that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965. According to Plaintiff, the provisions of the civil RICO statute allow him to bring suit in this Court, thus the mandatory language of the forum selection clause is inconsistent with federal law and is inapplicable due to the severability clause (Dkt. #94 at pp. 28–29).

Plaintiff's argument is unavailing. The language of the civil RICO venue provision is itself permissive. *See id.* ("Any civil action or proceeding under this chapter against any person *may* be instituted . . . .") (emphasis added). The Court is unaware of any federal caselaw supporting Plaintiff's contention that an otherwise permissive venue statute is "universal" and thereby transforms an otherwise mandatory forum selection clause into a permissive one (*See* Dkt. #94; Dkt. #138).[14] Ultimately, the Court finds that, even though the civil RICO statute may provide additional potential venues, the venue provision is not inconsistent with the enforcement of forum selection clause. *Cf. In re Fireman's Fund Inc. Cos.*, 588 F.2d 93, 95 (5th Cir. 1979) (finding that the Miller Act's venue provision may be varied by contractual forum selection clauses); *Mora v. Albertson's, L.L.C.*, EP-15-CV-00071-FM, 2015 WL 13804487, at *3 (W.D. Tex. May 15, 2015) (finding that the ERISA venue statute is not sufficient to override a forum selection clause); *Servewell Plumbing, LLC v. Fed. Ins. Co.*, 439 F.3d 786, 791–92 (8th Cir. 2006) (finding that a state's permissive venue statute did not invalidate a forum selection clause); *Omron Healthcare, Inc. v.*

---

[14] Plaintiff cites no caselaw to support his position that a federal statute providing a permissive venue option would invalidate or conflict with an otherwise mandatory forum selection clause (*See* Dkt. #94; Dkt. #138).

*Maclaren Exps. Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994) (enforcing a forum selection clause over the plaintiff's objection that the clause offended strong public policy of federal securities laws).

Having determined that the forum selection clause is mandatory, valid, applicable, and enforceable, it must be given "controlling weight" unless Plaintiff can show that this is an "unusual" case in which "extraordinary circumstances" defeat transfer. *See Atl. Marine*, 571 U.S. at 64; *Weber*, 811 F.3d at 776. To make this determination, the Court considers the public interest factors employed in a § 1404 motion. *Atl. Marine*, 571 U.S. at 64. Ultimately, focusing on the public interest factors leads to the refusal to enforce a forum selection clause in "truly exceptional circumstances." *Barnett*, 831 F.3d at 309. The party opposing transfer bears the burden to show that the public interest factors "overwhelmingly disfavor" transfer. *Atl. Marine*, 571 U.S. at 67.

Plaintiff does not fully address all of the public interest factors (*See* Dkt. #94; Dkt. #138). Instead, he only discusses the first two factors (Dkt. #94 at pp. 26–27). And, in any event, the Court's own analysis of the public interest factors makes clear that this is not a rare case in which "extraordinary circumstances" defeat a valid and enforceable forum selection clause. *Id.* at 64.

The first public interest factor looks to the administrative difficulties flowing from court congestion. *Stellar Restoration Servs., LLC v. James Christopher Courtney*, 553 F. Supp. 3d 394, 427 (E.D. Tex. 2021). "This factor 'considers not whether transfer will reduce a court's congestion, but whether a trial may be speedier in another district because of its less crowded docket.'" *Davis*, 2023 WL 4670491, at *16 (quoting *Stellar Restoration Servs.*, 553 F. Supp. 3d at 427). This is the most speculative of the public interest factors and should not be given more weight than the other factors. *Id.* (citing *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 871 (E.D. Tex. 2012)).

For the twelve-month period ending on March 31, 2025, the Eastern District of Texas had 824 pending cases per judge, with a weighted caseload of 853 cases per judge.[15] *United States District Courts—National Judicial Caseload Profile*, UNITED STATES COURTS 1, 35 (Mar. 31, 2025) http://uscourts.gov/sites/default/files/document/fcms_na_distprofile0331.2025.pdf. The median time from filing to disposition was 7.4 months. *Id.* The median time from filing to trial was 25.9 months. *Id.* In contrast, over the same time period, the Southern District of New York saw 596 pending cases per judge, with a weighted caseload of 465 per judge. *Id.* at 11. The median time from filing to disposition was 5.9 months, while the median time to trial was 33.6 months. *Id.*

This factor generally weighs in favor of the district with fewer cases per judge. *See Frito-Lay*, 867 F. Supp. 2d at 871–72. However, courts have also found this factor to weigh in favor of the district with a faster time for disposition of civil cases. *See Young v. Cap. One Bank USA NA*, No. 3:22-CV-00647, 2022 WL 17084387, at *4 (N.D. Tex. Nov. 18, 2022). Still others have found that the relevant metric is which court has a faster median time to trial. *See In re Genentech, Inc.*, 566 F.3d 1338, 1347 (5th Cir. 2009); *Gates Learjet Corp. v. Jenson*, 743 F.2d 1325, 1337 (8th Cir. 1987). While it is true that a case may proceed to trial faster in this Court, the median time for disposition of a case is faster in the Southern District of New York. Further, the Southern District of New York has a lower caseload and weighted caseload per Judge than the Eastern District. Ultimately, the Court finds that this factor weighs in favor of transferring the case.

---

[15] "Weighted filings statistics account for the different amounts of time district judges require to resolve various types of civil and criminal actions." *Explanation of Selected Terms*, UNITED STATES DISTRICT COURTS, https://www.uscourts.gov/sites/default/files/document/explanation-of-selected-terms-march-2025.pdf. The Court notes that the Sherman Division's weighted caseload as of February 28, 2025, was 4,153. Michelle Casady, *EDTX Chief Judge Mazzant Carves Up Sherman Docket, Four More Judges Take a Share*, The Texas Lawbook (Mar. 13, 2025), https://texaslawbook.net/edtx-chief-judge-mazzant-carves-up-sherman-docket-four-more-judges-take-a-share/.

The second public interest factor assesses the local interests implicated in the case to "uphold the principle that jury duty is a burden that ought not be imposed on the people of a community which has no relation to the litigation." *See Stellar Restoration Servs.*, 533 F. Supp. 3d at 428. Generally, this factor weighs in favor of the district in which the acts giving rise to the lawsuit occurred. *Id.* Thus, Texas has a localized interest in a case involving a Texas plaintiff alleging that he suffered harm in the state. *See id.* At the same time, however, a judicial district has "a strong local interest" in a case involving a corporate party headquartered in that district. *Moates v. Facebook, Inc.*, No. 4:21-cv-00694, 2022 WL 2707745, at \*5 (E.D. Tex. June 13, 2022), *report and recommendation adopted*, No. 4:21-cv-004, 2022 WL 2705245 (E.D. Tex. July 12, 2022) (finding that the Northern District of California "has a strong interest" in deciding a case involving Meta, "given that [Meta] is headquartered in California."). Here, Plaintiff is a Texas resident who was injured while in the state, thus Texas has a localized interest (Dkt. #94 at pp. 26–27). However, according to the Complaint, Morgan Stanley, Morgan Stanley & Co. LLC, and Morgan Stanley Smith Barney LLC are all headquartered in New York (Dkt. #1 at ¶ 9). Thus, New York also has a "strong local interest" in the case. *See id.* Accordingly, the Court finds that this factor is neutral.

The third public interest factor looks to the relative familiarity of the transferor and transferee districts with the law that will govern the case. *See, e.g.*, *Stellar Restoration Servs.*, 533 F. Supp. 3d at 428. Plaintiff has alleged both state and federal claims against Morgan Stanley (*See* Dkt. #1 at ¶¶ 458–587). Both this Court and the Southern District of New York are equally familiar with the federal laws at issue in this case. As previously discussed, the 1994 and 1997 Agreements contain a choice of law clause selecting New York law to govern all disputes "arising out of or relating to [Plaintiff's] accounts" (Dkt. #48–3 at p. 4; Dkt. #48-4 at p. 5). *See supra* Section V.B.2.a.

Currently, neither party has briefed which claims are subject to Texas law and which are subject to New York law. This Court is perfectly capable of applying New York law, to the extent it applies. Likewise, the Southern District of New York is perfectly capable of applying Texas law, if it applies at all. Thus, the Court finds this factor is neutral.

The final public interest factor looks to the likelihood of unnecessary problems of conflict of laws or in the application of foreign law. *See Coleman*, 2020 WL 2200220, at *7. There is no indication that this factor is implicated here, and the Court considers it neutral. In summary, three of the public interest factors are neutral, while one weighs in favor of transfer to the Southern District of New York. As a result, this case falls short of the rare instance in which the public interest factors "overwhelmingly disfavor" transfer. *Atl. Marine*, 571 U.S. at 64. The Court therefore concludes that the forum selection clause, which represents Plaintiff and Morgan Stanley's agreement to litigate this dispute in New York, must be given "controlling weight." *Id.*

## C. Severance

The transfer analysis becomes more complex where, as here, not all of the parties are bound by the same forum selection clause. *See In re Rolls Royce Corp.*, 775 F.3d 671, 679 (5th Cir. 2014) ("For cases where all parties signed a forum selection contract, the analysis is easy: Except in a truly exceptional case, the contract controls. But not so where, as here, not all parties to the lawsuit have entered into a forum selection agreement."). In such situations, the Court has three options: (1) transfer the entire case; (2) sever and transfer only the parties bound by the forum selection clause; and (3) maintain the entire lawsuit in this district notwithstanding the forum selection clause. *Royal Smith Transformers BV v. HC BEA-LUNA M/V*, No. 16-14647, 2017 WL 819243, at *3 (E.D. La. Mar. 2, 2017) (citing *Rolls Royce*, 775 F.3d at 679). The Fifth Circuit has held that "[a] district court has wide discretion to sever a claim against a party into separate cases." *Rolls*

66

*Royce*, 775 F.3d at 680. However, the severance inquiry is different "and more focused on judicial efficiency—when it is combined with a section 1404 motion to transfer than when the severed case would remain in the original judicial district." *Id.* When some parties, but not all parties, have entered into a forum selection clause, a severance-and-transfer inquiry involves three steps:

> First, pursuant to *Atlantic Marine*, the private factors of the parties who have signed a forum agreement must, as a matter of law, cut in favor of severance and transfer to the contracted forum. Second, the district court must consider the private factors of the parties who have not signed a forum selection agreement as it would under a Rule 21 severance and section 1404 analysis. Finally, it must ask whether this preliminary weighing is outweighed by the judicial economy considerations of having all claims determined in a single lawsuit. . . While judicial economy is not the sole consideration for a district court facing a severance-and-transfer motion, it retains a cardinal role.

*Id.* at 681.

Under the Fifth Circuit's analysis, the first factor weighs in favor of severance and transfer, because Plaintiff and Morgan Stanley have a contractually agreed on forum selection clause, which the Court has found governs the dispute. *See supra* Section V.B. Additionally, the Court finds that transfer of the entire case at this time is not appropriate as it has found that Plaintiff should be compelled to arbitrate his claims against Merrill Lynch and Deutsche Bank, as well as the arbitrability of his claims against Charles Schwab. *See supra* Sections III–IV. As part of compelling arbitration, the Court is required to stay the remaining litigation against those Defendants. *See, e.g.*, *U.S. ex rel. John Jamar Const. Servs. v. Travelers Cas. And Sur. Co. of Am.*, No. H-14-3363, 2015 WL 757858, at *1 (S.D. Tex. Feb. 23, 2015) (citing 9 U.S.C. § 3). Thus, the Court must now proceed to the remainder of the test and weigh the private interest factors and judicial economy of severing and transferring Plaintiff's claims against Morgan Stanley. Ultimately, the Court finds that severance and transfer is proper.

### 1.    The Private Factors of the Remaining Defendants

The Court finds that the private interest factors of the remaining Defendants weighs in favor of severance and transfer. All three of the remaining Defendants have moved for the Court to compel arbitration in a non-judicial forum (Dkt. #32 at pp. 10–15; Dkt. #46 at pp. 18–22; Dkt. #47 at pp. 17–20). As a result, the Court concluded that arbitration is appropriate under the corresponding agreements. *See supra* Sections III-IV. Thus, whatever private interests the remaining Defendants may have are negligible at this time. *See Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 435 (E.D.N.Y. 2014). Furthermore, Deutsche Bank essentially agreed with Morgan Stanley that the case should be transferred to the Southern District of New York, albeit through the forum selection clause in the Agreement between Plaintiff and Deutsche Bank (Dkt. #46 at pp. 22–29; Dkt. #46-5 at p. 4; Dkt. #46-6 at pp. 5–6). Additionally, even assuming Merrill Lynch and Charles Schwab oppose the transfer of the claims against Morgan Stanley, they have not provided any evidence or argument that their private interests favor retaining the entire lawsuit in this Court. Thus, at this point in the analysis, the Court finds the first two considerations weigh in favor of severing Plaintiff's claims against Morgan Stanley and transferring them to the Southern District of New York. *See Buc-ee's, Ltd. v. Bucks, Inc.*, 262 F.3d 453, 465 (S.D. Tex. 2017).

### 2.    Judicial Economy Concerns

The final prong of *Rolls Royce* requires the Court to examine whether the preliminary weighing under the other prongs is "outweighed by the judicial economy considerations of having all claims determined by a single lawsuit." 775 F.3d at 681. A primary concern of the public interest factors is also judicial economy. *U.S. for Use and Benefit of Exposed Roof Design, LLC v. Tandem Roofing, LLC*, No. 23-2293, 2023 WL 7688584, at *4 (E.D. La. Nov. 15, 2023). The Court has already found that one of the public interest factors in this case weighs in favor of transfer and three

are neutral. *See supra* Section V.B.2.c. Additionally, the Court finds that judicial economy is neutral as the Court has already found Plaintiff must arbitrate his disputes with the remaining Defendants—thereby leaving Morgan Stanley as the only Defendant to litigate in court. *See supra* Sections III–IV; *See Paduano*, 55 F. Supp. 3d at 435. Thus, the Court finds that judicial economy considerations do not weigh against severance and transfer. Accordingly, Plaintiff's claims against Morgan Stanley should be severed and transferred to the Southern District of New York.

## CONCLUSION

It is therefore **ORDERED** that:

1. Plaintiff's Motion for Leave to Amend the Complaint (Dkt. #143) is hereby **DENIED**.

2. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Motion to Compel Arbitration (Dkt. #32) is hereby **GRANTED**. Plaintiff John A. Mansour's claims against Merrill Lynch shall be submitted to FINRA for arbitration, pursuant to the parties' agreement.

3. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated's Motion to Dismiss (Dkt. #44) is hereby **DENIED as moot**.

4. Defendant Deutsche Bank Securities Inc.'s Motion to Compel Arbitration (Dkt. #46) is hereby **GRANTED**. Plaintiff John A. Mansour's claims against Deutsche Bank shall be submitted to FINRA for arbitration, pursuant to the parties' agreement.

5. Defendant Charles Schwab & Co., Inc.'s Motion to Compel Arbitration (Dkt. #47) is hereby **GRANTED**. Plaintiff John A. Mansour's claims against Charles Schwab shall be submitted to FINRA for arbitration to determine the arbitrability of Plaintiff's claims, pursuant to the parties' delegation clause.

6. Defendant Morgan Stanley's Motion to Sever and Transfer (Dkt. #48) is hereby **GRANTED**. The Court hereby **SEVERS** Plaintiff's claims against Morgan Stanley and the Clerk is **DIRECTED** to **TRANSFER** the claims against Morgan Stanley to the United States District Court for the Southern District of New York.

7. Defendant Morgan Stanley's Motion to Strike portions of Plaintiff's Sur-Reply (Dkt. #141) is hereby **GRANTED**. Section I of Plaintiff's Sur-Reply is hereby **STRICKEN** (Dkt. #138 at pp. 4–7). Morgan Stanley's Motion for Leave to file a Sur-Sur-Reply is hereby **DENIED as moot**.

8. All litigation in the present lawsuit is **STAYED** pending arbitration.

9. All other relief requested in these motions not previously granted is hereby **DENIED** without prejudice.

**IT IS SO ORDERED.**

**SIGNED this 15th day of August, 2025.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE